**In re DOW CORNING CORPORATION,**
**Debtor.**

**Bankruptcy No. 95–20512.**

United States Bankruptcy Court,
E.D. Michigan,
Northern Division.

Dec. 2, 1999.

See also 244 B.R. 718; 244 B.R. 673; 244 B.R. 678; 244 B.R. 696; 244 B.R. 705; 244 B.R. 721.

Barbara J. Houser, George Tarpley, Craig J. Litherland, David Bernick, David Ellerbe, Sheinfeld, Maley & Kay, P.C., for Debtor.

Ogden N. Lewis, Michael S. Flynn, Davis Polk & Wardwell, Sheryl L. Toby, Honigman, Miller, Schwartz & Cohn, for the Official Committee of Unsecured Creditors.

Ralph R. Mabey, LeBoeuf, Lamb, Greene & MacRae, L.L.P., Robert S. Hertzberg, Hertz, Schram & Saretsky, P.C., for Halcyon.

Charles Wolfson, for Certain New Zealand Claimants.

David J. Hutchinson, Fernando Vergueiro, for Brazilian Claimants.

John White, Jr., Geoffrey White, for Class 5 Nevada Claimants.

Kenneth H. Eckstein, Jeffrey S. Trachtman, Kramer Levin Naftalis & Frankel LLP, for the Official Committee of Tort Claimants.

Mark Phillips, H. Jeffrey Schwartz, for Official Committee of Physicians Claimants.

Glenn Gillette, for the United States Government.

Sybil Shainwald, Stephen H. Weiner, for Foreign Claimants.

John T. Johnson, P.C., for Certain Claimants from The Netherlands.

Peter Cashman, David Goroff, for Australian Claimants.

Leslie K. Berg, Office of the U.S. Trustee.

## AMENDED OPINION ON THE CLASSIFICATION AND TREATMENT OF CLAIMS

ARTHUR J. SPECTOR, Chief Judge.

The Debtor and the Official Committee of Tort Claimants negotiated and on November 9, 1998 filed a Joint Plan of Reorganization. The plan (hereafter referred to simply as the "Plan") was subsequently amended on February 4, 1999 and modified various times. The hearing on confirmation of the Plan commenced on June 28, 1999 and closing arguments were heard on July 30, 1999. Several post-hearing briefs and other submissions were received and the Court took the matter under advisement.

On this date the Court issued its Findings of Fact and Conclusions of Law on the matter of the confirmation of the Plan. To supplement and explicate some of the findings and conclusions, the Court contemporaneously releases this opinion and several others.

A number of general unsecured creditors, whose claims arose from the Debtor's manufacture and sale of silicone-gel breast implants, objected to confirmation of the Plan. The objections addressed in this opinion assert that the Plan does not comply with 11 U.S.C. §§ 1122(a) and 1123(a)(4).[1] The Court disagrees, and for

---

**1.** Unless otherwise noted all statutory references are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

the reasons stated below these objections are overruled.

## I. Background

Section 1129(a) sets forth 13 requirements for confirmation of the plan, one of which is that a plan of reorganization must "compl[y] with all applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1). Two of those applicable provisions are §§ 1122(a) and 1123(a)(4). Section 1122(a) governs claim classification and § 1123(a)(4) provides general requirements for within-class treatment of claims.

The Plan divides claims and interests into 33 classes and subclasses. The following classes are relevant to this opinion: Class 4 Unsecured Commercial Claims; Class 5 Domestic Breast Implant Claims; Class 6.1 Foreign Breast Implant Claims; Class 6.2 Foreign Breast Implant Claims; Class 7 Silicone Material Claims; Class 12 Physician Claims; and Class 15 Government Payor Claims.[2]

Class 4 is made up of all unsecured commercial claims against the Debtor. *Amended Joint Disclosure Statement With Respect to the Amended Joint Plan* (the *"Disclosure Statement"*) § 6.1(C)(8). Claimants in this class will be paid in full with interest and will also be entitled to receive any fees, costs and expenses that are allowable under applicable law. On the Effective Date, or as soon as practicable thereafter, each Class 4 claimant will be paid in cash an amount equal to up to 24% of its allowed claim. Each Class 4 claimant will then receive a Senior Note for the balance of its claim. *Plan* § 5.1.

In general, Class 5 consists of breast-implant claims against the Debtor held by claimants who are either citizens of the United States or are resident aliens within the United States, Puerto Rico, the territories of the United States, or a United States military facility (hereafter these geographic areas are referred to as the "Greater U.S."). *Disclosure Statement* § 6.1(C)(4). Claims of those who do not meet the above citizenship or residency requirements, but who had their breast-implant procedures performed inside the Greater U.S. are also categorized in Class 5.

The Plan would provide domestic breast-implant claimants with the option to either settle or litigate their claims against the Debtor. The claims of those who opt to settle would be channeled to the Settlement Facility. Once there, claimants would be given the opportunity to qualify for a number of different settlement levels ranging from an expedited payment of $2,000 to a payment of $300,000 for the most severe injuries. *Id.* at 20. Class 5 claimants who choose to litigate would be channeled to the Litigation Facility.

Classes 6.1 and 6.2 are composed of breast-implant claims against the Debtor held by individuals who are neither citizens of the United States nor resident aliens of the Greater U.S., and who had their breast implant procedures performed outside the Greater U.S. *Plan* § 1.67. A foreign breast implant claim is in Class 6.1 if the claimant is a resident of a country that either: belongs to the European Union, has a common law tort system, or has a per capita gross domestic product ("GDP")

---

**2.** The other classes of claims or interest contained in the Plan are:1—Other Priority Claims; 2—Secured Claims; 3—Convenience Claims; 4A—Prepetition Judgment Claims; 4B—Guaranty Claims; 6A—Quebec Class Action Claimants; 6B—Ontario Class Action Claimants; 6C—British Columbia Class Action Claimants; 6D—Electing Australia Breast Implant Settlement Claimants; 7—Silicone Material Claims; 8—Miscellaneous Raw Material Claims; 9—Domestic Other Products; 10.1—Foreign Other Products; 10.2—Foreign Other Products; 11—Co–Defendant Claims; 13—Health Care Provider Claims; 14—Domestic Health Insurer Claims; 14A—Foreign Health Insurer Claims; 16—Shareholder Claims; 17—General Contribution Claims; 18—Long Term Contraceptive Implant ("Norplant") Personal Injury Claims; 19—LTCI Other Claims; 20—Intercompany Claims; 21—Subordinated Claims; 22—Environmental Claims; 23—Retiree Benefit Claims; 24—Interest Holders.

that is greater than 60% of the United States' per capita GDP. The claims of foreign breast-implant claimants who are residents of countries that do not meet one of these requirements are placed in Class 6.2.[3]

Like domestic breast-implant claimants, all foreign claimants are given the opportunity to either settle or litigate their claims. The claims of those who elect to settle are channeled to the Settlement Facility where they are given the opportunity to qualify for the same settlement levels that are offered to domestic breast-implant claimants. It is at this point in the settlement process that treatment of domestic and foreign breast-implant claims diverge. Settlement payments to Class 6.1 claimants would be 60% of the amounts paid to domestic breast-implant claimants. Class 6.2 claimants would receive settlement payments that are 35% of the amounts paid to domestic breast-implant claimants.

Class 7, Silicone Material Claims, consists of claims held by both foreign and domestic claimants and which arise from the claimant's use or implantation of a breast-implant manufactured by a company other than the Debtor. The manufacturer in question must be an entity that is either domiciled or has its manufacturing facilities in the United States. In addition, the manufacturer must have purchased medical-grade gel systems from the Debtor. *Id.* § 1.166.

Class 7 claimants, like other breast-implant claimants, will be able to resolve their claims through litigation or settlement. Those choosing to settle will be paid from a fixed fund of $57.5 million and will have two settlement options, an expedited-release payment and a disease-option payment. *Disclosure Statement* at § 6.6(J)(2)(b). Claimants selecting the expedited-release payment will each receive the same amount, an amount which is to be determined by the Claims Administrator at a later date. *Id.* Claimants choosing the disease-option payment will be able to qualify for the same settlement grid levels as breast-implant claimants in Classes 5, 6.1 and 6.2. But payments under this option will be no more than 40% of the amount paid to a breast-implant claimant under the equivalent grid level. *Id.* All settlement payments to Class 7 claimants will be subject to a dollar-for-dollar reduction for any payment that the claimant has received or is eligible to receive from the actual manufacturer of the breast implant. This reduction will not apply, however, if the breast implant was manufactured by CUI, Mentor or Bioplasty, since those companies have been liquidated through bankruptcy proceedings. *Id.*

The Plan classifies all physician claims in Class 12. These claims arise out of the Debtor's manufacture and sale of silicone-gel breast implants and other medical products and the marketing and provision

---

**3.** The disclosure statement filed in connection with the Plan identifies the countries that the Proponents believe to be within each of these classes. According to the disclosure statement, claims held by claimants from the following countries are placed in Class 6.1: Australia, Canada, New Zealand, United Kingdom, Austria, Bahamas, Belgium, Bermuda, Cayman Islands, Denmark, Finland, France (including French Polynesia and New Caledonia), Germany, Greece, Hong Kong, Iceland, Ireland, Italy, Japan, Kuwait, Liechtenstein, Luxembourg, Monaco, Netherlands, Norway, Portugal, Singapore, Spain, Sweden, Switzerland, United Arab Emirates.

According to the disclosure statement, claims held by individuals from the following countries are classified in Class 6.2: Argentina, Barbados, British Virgin Islands, Chile, Cyprus, Czech Republic, Israel, Korea, Malaysia, Malta, Mauritius, Qatar, Saudi Arabia, Taiwan, Algeria, Belize, Bolivia, Botswana, Brazil, Bulgaria, Cambodia, Central African Republic, China, Colombia, Cook Islands, Costa Rica, Côte-d'Ivoire (Ivory Coast), Croatia, Cuba, Dominican Republic, Ecuador, Egypt, Estonia, Fiji, Ghana, Grenada, Guatemala, Guyana, Haiti, Honduras, Hungary, India, Indonesia, Jamaica, Jordan, Kenya, Lebanon, Lithuania, Mali, Mexico, Morocco, Namibia, New Guinea, Nicaragua, Nigeria, Oman, Pakistan, Panama, Paraguay, Peru, Philippines, Poland, Saint Kitts and Nevis, Senegal, South Africa, Thailand, Tonga, Turkey, Uruguay, Venezuela, Vietnam, Zambia, Zimbabwe.

of such products to physicians. *Disclosure Statement* at 12. Physician claims are of two types. Most physician claimants seek reimbursement or indemnification from the Debtor in the event that the physician claimant is found personally liable for the injuries allegedly caused by the implants to the implant recipients. These claims have been dubbed "Physician Derivative Claims." A few physician claimants also assert what are called "Physician Direct Claims." This type of claim alleges, for example, that in its marketing, sale and provision of breast implants to physician claimants, the Debtor fraudulently misrepresented the extent and results of testing on breast-implant safety and that, as a result of such misrepresentation, these physicians suffered direct injury such as loss of profit or damage to reputation. *Id.*

The Plan would provide physician claimants with the choice to either settle or litigate their claims against the Debtor. Regardless of the route taken by the physician claimant, however, her claims would be treated in an aggregated manner. That is, a physician claimant who chooses to settle would have to settle all of her claims against the Debtor, both derivative and direct. A physician claimant who chooses to litigate would have to litigate all of her claims against the Debtor. *Id.* The settlement offer extended to physician claimants is not in the form of cash. Instead, in return for releasing all Physician Derivative and Direct Claims that they have against the Debtor and all other parties to be released under the Plan, the settling physician claimants would receive a release: from all products-liability-based claims held against them by the Debtor and all other parties to be released under the Plan; and from all breast-implant and other personal injury claims (except for malpractice claims as that term is defined in the Plan) that settling personal injury claimants hold against settling physician claimants. *Id.* at 12–13. Settling physician claimants will not be released, however, as to breast-implant claimants and other personal injury claimants who choose to

litigate their claims against the Debtor. Physician claimants who opt for litigation would have all of their claims, both derivative and direct, channeled to the Litigation Facility. Litigating physician claimants would not receive the release protection afforded to settling physician claimants. *Id.* at 13.

Class 15 is composed of all "Government Payor Claims." A Government Payor is defined as a Governmental Unit that has paid or provided medical care for injuries allegedly arising out of the Debtor's manufacture and sale of silicone-gel breast implants and other medical products. *Plan* § 1.71. The class includes claims filed by the United States on behalf of the Department of Health and Human Services (including the Indian Health Service) ("IHS"), the Health Care Financing Administration ("HCFA"), the Department of Defense ("DoD"), and the Department of Veteran's Affairs ("VA"). The only other Class 15 claimants are the Canadian provinces of Alberta and Manitoba ("Alberta" and "Manitoba"). *Post–Hearing Memorandum of [the Proponents] Supporting Confirmation* at 28–29.

The Plan provides that unless a Class 15 claim is consensually resolved, the Proponents will seek to have the claim estimated for distribution on or before the Confirmation Date. *Plan* § 5.13.5. Class 15 claims which become allowed in this manner would be paid on the Effective Date with cash and senior notes. *Id.* § 6.11.8. Class 15 claims not resolved through this method will be channeled to the Litigation Facility for liquidation. *Id.* § 5.13.5. A Class 15 claim liquidated through the Litigation Facility would then be paid by the Settlement Facility with funds provided pursuant to the Settlement Facility Agreement and Funding Payment Agreement. *Disclosure Statement* § 6.6(G)(4).

Objections to claim classification are discussed in Part II of this opinion. Part III addresses the objections made to within-class claim treatment. As the following

analysis will demonstrate, the Plan complies with both § 1122(a) and § 1123(a)(4).

## II. Classification of Claims Under the Plan

### A. Standards Governing Classification

■ Claims may be classified together only if they are "substantially similar" to one another. 11 U.S.C. § 1122(a) ("[A] plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."). "Substantially similar" means similar in legal nature, character or effect. 7 *Collier on Bankruptcy* ¶ 1122.03[3] (15th ed. rev. 1999); *see also In re Johnston*, 21 F.3d 323, 327 (9th Cir.1994).

■ Section 1122(a) speaks solely to the types of claims that can be classified together. It does not address the question of whether substantially similar claims may be classified separately. *In re U.S. Truck Co.*, 800 F.2d 581, 585 (6th Cir. 1986). Virtually every circuit that has encountered the issue, including the Sixth, has held that substantially similar claims may be classified separately. *Id.* at 585–86; *Aetna Cas. & Surety Co. v. Clerk, U.S. Bankruptcy Court (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2nd Cir.1996); *In re Barakat*, 99 F.3d 1520, 1526 (9th Cir. 1996); *In re Woodbrook Assoc.*, 19 F.3d 312, 317–18 (7th Cir.1994); *John Hancock Mutual Life Ins., Co. v. Route 37 Business Park Assoc.*, 987 F.2d 154, 158 (3rd Cir. 1993); *In re Bryson Properties, XVIII*, 961 F.2d 496, 502 (4th Cir.1992); *In re Greystone III Joint Venture*, 995 F.2d 1274, 1278–79 (5th Cir.1991); *Olympia & York Florida Equity Corp. v. Bank of New York (In re Holywell Corp.)*, 913 F.2d 873, 880 (11th Cir.1990); *Hanson v. First Bank of South Dakota, N.A.*, 828 F.2d 1310, 1313 (8th Cir.1987); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1150 (D.C.Cir.1986).

■ Most of these courts, however, also take the view that there are limits on a plan proponent's classification freedom. *See, e.g., U.S. Truck*, 800 F.2d at 586; *Bryson Properties*, 961 F.2d at 502; *Greystone III*, 995 F.2d at 1279. In short, they reason that substantially similar claims may not be classified separately when it is done for an illegitimate reason. *U.S. Truck*, 800 F.2d at 585–87; *Chateaugay*, 89 F.3d at 949; *Woodbrook Assoc.*, 19 F.3d at 318; *John Hancock*, 987 F.2d at 158; *Bryson Properties*, 961 F.2d at 502; *Greystone III*, 995 F.2d at 1278–79; *In re Jersey City Medical Center*, 817 F.2d 1055, 1061 (3d Cir.1987). *Cf. Hanson*, 828 F.2d at 1313; *AOV Indus.*, 792 F.2d at 1150.[4] Whether the reason proffered is legitimate is a factual determination that must be made on a case-by-case basis. *See U.S. Truck*, 800 F.2d at 586 (Bankruptcy courts have "broad discretion to determine proper classification according to the factual circumstances of each individual case."); *see also Chateaugay*, 89 F.3d at 949 ("[T]o warrant having separate classification of similar claims, the debtor must advance a legitimate reason supported by credible proof."); *see also In re Stratford Assocs. Ltd. Partnership*, 145 B.R. 689, 695 (legitimate reason for separately classifying similar claims exists "so long as such classification is based on legal or factual distinctions").

---

4. The Ninth Circuit has held that a plan proponent may classify substantially similar claims separately only when there is "legitimate business or economic justification" for doing so. *In re Barakat*, 99 F.3d 1520, 1526 (9th Cir.1996). Adding the terms "business or economic" to the test of when substantially similar claims may be classed separately would seem to be unnecessary gloss that can only serve to further muddle the classification analysis. After all, the purpose of the reorga- nization process is to develop a plan that pays creditors to the greatest extent possible while at the same time enabling the debtor to continue operating as a viable business entity. In other words, the entire plan of reorganization is created for a business or economic purpose. This of course means that any time a legitimate reason exists for structuring a plan in a particular manner—including a proposed classification scheme—that reason is *a fortiori* business or economic in nature.

## B. Comment on Classification Standards

Before applying the "legitimate reason" standard to the current objections, we pause to comment on this standard's correctness. We do so for two important reasons. First, as will be discussed below, this Court believes that the standard is wrong as a matter of law. And second, the real world costs of applying this legally incorrect standard can be enormous. In this case, for example, attorneys for a number of the foreign breast-implant claimants argued that the Proponents had not demonstrated a "legitimate reason" for classifying their claims separately from domestic breast-implant claims. Evidence and argument on the classification objections were presented to the Court during the confirmation hearing over the course of approximately six days. And as part of their case, the Proponents brought in a number of comparative law experts from countries such as England and Australia. It is safe to say that the costs incurred by the Debtor to properly respond to the classification objections ranged into the six-figures. It is bad enough that a debtor may be required to ante up this needless expense; it would be even worse if the debtor were insolvent and the money is taken from the pot established for creditors. In addition, the judicial resources involved in addressing such objections also can be substantial. Sadly, none of this time and expense would have been necessary if § 1122(a) were interpreted, as it should be, in accordance with its plain language.

The development of this standard occurred primarily in the context of cases where separate classification of substantially-similar claims had allegedly been done solely for the purpose of gerrymandering the vote on the plan.[5] In one of the first Code cases to address this issue, the Sixth Circuit stated that "there must be some limit on a debtor's power to classify" such claims separately when the singular reason for doing so is to ensure that at least one accepting class of impaired creditors exists for cramdown purposes. *U.S. Truck*, 800 F.2d at 586. Otherwise, the court reasoned, "[t]he potential for abuse would be significant." *Id.*

Thereafter, the Eight and Eleventh Circuits agreed with this reasoning. *See Holywell Corp.*, 913 F.2d at 880; *Hanson*, 828 F.2d at 1313. The Fifth Circuit also agreed with *U.S. Truck's* "potential for abuse" assessment. *Greystone III*, 995 F.2d at 1279. But in the course of its analysis, *Greystone III* also suggested that a broad interpretation of § 1122(a) would render §§ 1122(b) and 1111(b) superfluous. *Id.* at 1278–80. *Greystone III's* reasoning, which will be discussed in greater detail below, led to its frequently cited "one clear rule" pronouncement: "[T]hou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Id.*

Perhaps it is because the three words prefacing this statement convey the feel of a command set in stone, but for whatever reason, most courts have, with little question, accepted this judicial pronouncement as the supreme rule governing classification decisions. *Barakat*, 99 F.3d at 1525;

---

5. There is no evidence suggesting that the Plan's classification scheme was designed with such an objective in mind. In fact, such a conclusion would be counterintuitive. Twenty-four classes voted to accept it. And most of those 24 classes accepted by overwhelming margins. Not surprisingly, no meaningful allegation of gerrymandering was made by any of the objecting parties. Moreover, even if the Proponents admitted that they classified these similar claims separately in order to obtain an accepting impaired class, so long as there is another legitimate reason supporting separate classification, the separate classification can be upheld. *See In re U.S. Truck Co.*, 800 F.2d 581, 586 & n. 8 (6th Cir.1986) (Although the plan proponent admitted that it separately classified the Teamsters Committee's unsecured claims from the other unsecured claims in order to obtain at least one accepting impaired class of claims, the court held that independent justifications made the classification permissible.).

*In re Boston Post Road Ltd. Partnership,* 21 F.3d 477, 481–83 (2d Cir.1994); *Woodbrook Assoc.,* 19 F.3d at 317–18; *John Hancock,* 987 F.2d at 160; *Bryson Properties,* 961 F.2d at 502. *John Hancock* further suggested that a broader interpretation of § 1122(a) than that ascribed by *Greystone III* would enable plan proponents to circumvent the requirements of § 1129(a)(10). *John Hancock,* 987 F.2d at 159.

*Greystone III's* "one clear rule" directive certainly has superficial appeal. But the reasoning which underlies it cannot withstand legal scrutiny. Even worse, its real world application actually makes the reorganization process, and classification issues in particular, needlessly complex, costly and unpredictable.

■ To see why, we must begin with the language of § 1122(a) which merely provides that "a plan may place a claim . . . in a particular class only if such claim . . . is substantially similar to the other claims . . . of such class." 11 U.S.C. § 1122(a). The plain language of this provision would seem to require a court to do nothing more than look at each individual class and determine whether the claims within that class are substantially similar. *U.S. Truck,* 800 F.2d at 585 ("[B]y its express language, [§ 1122(a)] only addresses the problem of dissimilar claims being included in the same class."). Under commonly accepted rules of statutory interpretation, this is where the analysis would normally end. *See United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *see also Hudson v. Reno,* 130 F.3d 1193, (6th Cir.1997) ("If the words of the statute are unambiguous, the judicial inquiry is at an end, and the plain meaning of the text must be enforced.").

As exemplified by the Sixth Circuit, however, courts have not done this. *See U.S. Truck,* 800 F.2d at 584 (stating, as justification for its reliance on § 1122(a)'s legislative history, that "Congress has sent mixed signals on the issue [of classification]"). The legislative history provides that § 1122(a) "requires classification based on the nature of claims . . . classified, and permits inclusion of claims . . . in a particular class only if such claim . . . being included is substantially similar to the other claims . . . of the class." S.Rep. No. 989. 95th Cong., 2d Sess. 118, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5904. This piece of legislative history appears to fully support the plain language interpretation of § 1122(a) noted above. However, the legislative history also states that § 1122(a) "codifies current case law surrounding the classification of claims." *Id.* Unfortunately, "[i]t is difficult to follow Congress' instruction to apply old case law to the new Code provision." *U.S. Truck,* 800 F.2d at 586. In part, the reason for this is that there were three forms of business reorganizations under the Act, one each under Chapters X, XI and XII. *See* Linda J. Rusch, *Gerrymandering The Classification Issue In Chapter Eleven Reorganizations* (hereafter *"Gerrymandering"*), 63 U. Colo. L.Rev. 163, 189 (1992).

Case law under Chapters XI and XII, which contained identical classification provisions, apparently placed no limits on a plan proponent's ability to separately classify substantially similar claims. *Id.* at 190 nn. 128 & 130 (and cases cited therein). Under Chapter X, courts would generally allow separate classification of similar claims when doing so was "in the best interest of creditors; fostered reorganization efforts; did not violate the absolute priority rule; and did not uselessly increase the number of classes." *In re AG Consultants Grain Div., Inc.,* 77 B.R. 665, 673 (N.D.Ind.1987) (Bankruptcy Code case surveying case law pertaining to classification under the Bankruptcy Act); *see also* Rusch, *Gerrymandering,* 63 U. Colo. L.Rev. at 190.

The first problem in applying cases decided under the Bankruptcy Act is knowing which case law Congress intended to codify. If it was case law interpreting

Chapters XI and XII which Congress meant to codify, it would seem appropriate to use the plain-language interpretation of § 1122(a) since such cases permitted a plan proponent to separately classify substantially similar claims. Arguably this same result obtains if it is case law interpreting Chapter X that is pertinent because most of the factors considered under Chapter X, such as whether a plan is in the best interest of creditors and whether it satisfies the absolute priority rule, are addressed under Code provisions other than § 1122(a). *See* 11 U.S.C. § 1129(a)(7) (best interest of creditors' test) and § 1129(b)(2) ("fair and equitable" standard includes the absolute priority rule). And once these factors are removed from the equation, there would seem to be no reason not to apply § 1122(a) in accordance with its plain language. Thus, even assuming that the straightforward language of § 1122(a) is not plain and that there is justification for relying on legislative history, doing so would seem only to lead to the same interpretive result as the plain language construction already noted.

■ Another common rule of statutory construction is that every provision of a statute should be construed so that no other provision is rendered superfluous or meaningless. *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998). As noted above, *Greystone III* and others expressed concern that if limits are not placed on a plan proponent's ability to classify substantially similar claims separately, then §§ 1122(b), 1111(b) and 1129(a)(10) would be rendered meaningless. But these concerns are unfounded.

■ *Greystone III* stated that "if § 1122(a) is wholly permissive regarding

the creation of . . . classes, there would be no need for § 1122(b) specifically to authorize a class of smaller unsecured claims." *Id.* at 1278; *see also* 11 U.S.C. § 1122(b) ("A plan may designate a separate class of claims consisting only of *every unsecured claim* that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." (emphasis added)). For this reason, the court concluded that a broader interpretation of § 1122(a) than the one expressed in its holding would render § 1122(b) superfluous. One must presume, then, that *Greystone III* saw § 1122(b) as an expression of Congressional intent to circumscribe a plan proponent's ability to place substantially similar claims in different classes. But for this to be correct, one would also have to take the view that "every unsecured claim" is substantially similar to every other unsecured claim. It makes little sense to conclude that Congress intended for two phrases contained in the same statute—"substantially similar [claims]" and "every unsecured claim"—to carry identical meanings. Moreover, there seems to be little dispute that unsecured claims can be substantially dissimilar in nature. In this case for instance, there is no question that while disputed and unliquidated personal injury breast-implant claims and undisputed and liquidated commercial claims are both unsecured, they may be separately classified.[6] Fortunately, there is a more reasonable construction of § 1122(b) which enables it to co-exist perfectly with a plain-language interpretation of § 1122(a)—that is, as a general rule only substantially-similar claims may be classified together. 11 U.S.C. § 1122(a).

---

**6.** Of course, had the Proponents wanted to, the Plan could have consisted of a single class of unsecured claims, as each holder of an unsecured claim of either type would have the same priority on the assets of the Debtor. *See, e.g., In re U.S. Truck Co.*, 47 B.R. 932, 938 (E.D.Mich.1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986) ("[A]s a general rule unsecured claims

normally comprise one class."); *In re Apex Oil Co.*, 118 B.R. 683, 696 (Bankr.E.D.Mo. 1990) (Classifying all. pre-petition general unsecured claims in one class is "the preferred course."). Our point is that the Code does not mandate a single class in such circumstances.

■ There will be times, however, when matters of administrative convenience make it "reasonable and necessary" to classify substantially dissimilar claims together. Section 1122(b) grants the court authority to do this when such circumstances arise. *See In re City of Colo. Springs Spring Creek Gen. Improvement Dist.,* 187 B.R. 683, 689 (Bankr.D.Colo. 1995) (Section 1122(b) allows dissimilar and *de minimis* unsecured claims to be classified together.); *In re ZRM–Oklahoma Partnership,* 156 B.R. 67, 70 n. 3 (Bankr.W.D.Okla.1993). Thus, a broad interpretation (or more precisely a plain-language interpretation) of § 1122(a) in no way renders § 1122(b) meaningless.

As indicated, *Greystone III* also relied on § 1111(b) to support its interpretation of § 1122(a). Such reliance, too, was misplaced. Without § 1111(b), an undersecured non-recourse creditor's potential recovery would be limited to the value of the collateral securing its claim because its deficiency claim would be subject to disallowance pursuant to § 502(b)(1). 4 *Norton Bankruptcy Law & Practice 2d* § 89:2 at 89–5. Any subsequent appreciation in the collateral would be captured by the debtor. Under Chapter XII of the Bankruptcy Act, which was available only to individuals and partnerships, this in fact was how the process worked. *Id.* (discussing effect of ruling in *In re Pine Gate Assoc., Ltd.,* 2 B.C.D. 1478 (Bankr.N.D.Ga.1976)). Had this process carried over into the Bankruptcy Code, these same opportunities would have become available to corporate debtors. The potential for such a development was perceived to pose a substantial threat to non-recourse secured lenders in the form of unrealistically low valuations of collateral. *Id.*

■ To mitigate this risk, Congress enacted § 1111(b). *Id.* Section 1111(b) permits an undersecured non-recourse creditor to choose between two possible treatments with respect to its deficiency claim. The creditor can elect to have its deficiency claim treated as a recourse unsecured claim, whereby it will then have the right to vote its claim in a class composed of substantially similar unsecured claims. 11 U.S.C. § 1111(b)(1)(A). Alternatively, such a creditor can choose to have the entirety of its claim treated as fully secured by its collateral. 11 U.S.C. § 1111(b)(2).

*Greystone III* postulated that if, any time an undersecured non-recourse creditor elects the § 1111(b)(1)(A) option, a plan proponent has the unfettered ability to place that claim in a class by itself, that creditor's "right to vote in the unsecured class would be meaningless." *Greystone III,* 995 F.2d at 1280–81. The result, according to *Greystone III,* would be as follows:

> Plan proponents could effectively disenfranchise the holders of such claims by placing them in a separate class and confirming the plan over their objection by cramdown. With its unsecured voting rights effectively eliminated, the electing creditor's ability to negotiate a satisfactory settlement of either its secured or unsecured claim[ ] would be seriously undercut. It seems that the creditor would often have to "elect" to take an allowed secured claim under § 1111(b)(2) in the hope that the value of the collateral would increase after the case is closed. Thus, the election under § 1111(b) would be essentially meaningless.

*Id.* at 1280.

■ Based upon this passage it appears that *Greystone III* attributed a broader purpose to § 1111(b) than was intended by Congress. *See* Bruce A. Markell, *Clueless on Classification: Toward Removing Artificial Limits on Chapter 11 Claim Classification* (hereafter *"Clueless"*), 11 Bankr.Dev. J. 1, 21 (1994–95) (observing that "[p]rohibiting separate classification for creditors who have ... made the [§ 1111(b)(1)(A) ] election ... gives the secured creditor more than Congress provided"). As noted, § 1111(b)

grants an undersecured non-recourse creditor the right to elect one of two types of treatment. This choice is an absolute right that cannot be denied by a plan proponent or the court. Consequently, if the creditor elects the § 1111(b)(1)(A) option—that is, if it opts to have a secured claim to the extent of the value of the collateral and to have the deficiency treated as an allowed unsecured claim—that is the treatment the creditor must receive under any plan that is confirmed. This is true whether confirmation of the plan is achieved on a consensual basis or through cramdown.

Moreover, the undisputed right to receive the selected treatment is all that § 1111(b) provides to the undersecured non-recourse creditor. There is nothing within the text of this section that suggests that it was intended to exclude such a creditor from the possibility of cramdown. Nor is there any language in this section suggesting that a creditor who chooses § 1111(b)(1)(A) must be placed in a class with every other unsecured creditor. And importantly, even if the plan proponent places such a creditor in its own class, this does not mean that the creditor is thereby disenfranchised from the bankruptcy process or that its vote somehow becomes meaningless. Markell, *Clueless*, 11 Bankr.Dev. J. at 20 ("[O]nly a myopic view of bankruptcy law would see the partially-secured creditor as disenfranchised."). The creditor will still retain the ability to object to any aspect of the proposed plan. If the creditor votes to reject the plan, the plan can be confirmed only if the cramdown requirements are satisfied. And, despite intimation to the contrary by *Greystone III*, satisfying the cramdown requirements is no small hurdle for a plan proponent to overcome.

▮ In addition, *Greystone III's* view of what constitutes a level field for purposes of negotiating a plan of reorganization is curious. Assume that there are two classes of unsecured creditors, one of which is composed entirely of the un-

dersecured non-recourse creditor's deficiency claim. Such a plan could be confirmed over the objection of the creditor only if all of the requirements of §§ 1129(a) and (b) are satisfied—including the b est-interest-of-creditors test and the absolute priority rule. Therefore, the undersecured creditor will likely be placed in a negotiating position of some strength. *See* Rusch, *Gerrymandering*, 63 U. Colo. L.Rev. at 197–98 (discussing aspects of the bankruptcy process that provide a dissenting undersecured nonrecourse creditor with negotiating leverage). On the other hand, assume that the undersecured creditor is classified, as *Greystone III* requires, with all other unsecured creditors and that its claim is of sufficient value to control the class vote. In such a case, the undersecured creditor will have more than a strong bargaining position; it will have absolute veto power over the plan. Markell, *Clueless*, 11 Bankr.Dev. J. at 21; Rusch, *Gerrymandering*, 63 U. Colo. L.Rev. at 204. And this will be the case regardless of whether the proposed plan is capable of satisfying all requirements of confirmation save for § 1129(a)(10). *See* 11 U.S.C. § 1129(a)(10) (providing that at least one impaired class of claims must have accepted the plan before it is eligible for cramdown). The chapter 11 reorganization process serves a number of important policy objectives including "debtor relief, a preference for feasible reorganizations as opposed to liquidations, equality among similarly situated creditors, and loss distribution in an equitable way among the creditors and the debtor." Rusch, *Gerrymandering*, 63 U. Colo. L.Rev. at 200. Under the second scenario just discussed, these important policy objectives will clearly be defeated. *Id.* It is doubtful that this is the impact that Congress intended for § 1111(b). Therefore, a plain language interpretation of § 1122(a) would not render § 1111(b) meaningless.

Lastly, we are left with *John Hancock's* reliance on § 1129(a)(10). Section

650

1129(a)(10) establishes the requirement that at least one class of impaired creditors must have accepted the plan before it can be eligible for cramdown. 11 U.S.C. § 1129(a)(10). Undoubtedly, it is this provision of the Code that sometimes causes plan proponents to place substantially similar claims in separate classes. In *John Hancock*, the court stated that

> where ... the sole purpose and effect of creating multiple classes is to mold the outcome of the voting, it follows that the classification scheme must provide a reasonable method for counting votes. In a "cram down" case, this means that each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed. Otherwise, the classification scheme would simply constitute a method for circumventing the requirement set out in ... § 1129(a)(10).

*John Hancock*, 987 F.2d at 159.

*John Hancock* was correct that the cramdown process should not be undertaken unless the rejecting class is properly constituted. The problem with the court's statement, however, is that the classification determination is not made pursuant to § 1129(a)(10), but pursuant to § 1122(a), which is incorporated into the confirmation process through § 1129(a)(1). *Cf.* Markell, *Clueless*, 11 Bankr.Dev. J. at 37 ("A flexible or expansive reading of section 1122 has little to do with section 1129(a)(10)."). Section 1122(a) requires the claims within each class to be substantially similar in legal nature and character. It does not require a finding that "each class ... represent a voting interest that is sufficiently distinct and weighty to merit a separate voice" in the confirmation process. And to this Court's knowledge there is nothing in the case law or legislative history that would require a court to ratchet the classification requirements up a notch whenever § 1129(a)(10) and cramdown come into play. Rusch, *Gerrymandering*, 63 U. Colo. L.Rev. at 185 ("[N]othing in the leg-

islative history of section 1129(a)(10) suggests that Congress intended that section to require the debtor to place all substantially similar claims into one class or that separate classification to create an accepting impaired class is abusive."). As a result, § 1129(a)(10) should not bear upon a determination of whether classification is proper pursuant to § 1122(a).

The above analysis demonstrates that § 1122(a) should not be circumscribed by judicially created limitations, but instead should be construed in accordance with its plain language. *Accord ZRM–Oklahoma*, 156 B.R. at 70–71. Classification objections should require a court to look only at whether the claims within a class are substantially similar. And importantly, § 1122(a) should not be viewed as prohibiting a plan proponent from placing substantially similar claims in different classes regardless of whether it has proven a "legitimate reason" for doing so. Such an interpretation of § 1122(a) does not conflict with or render meaningless any other provision of the Bankruptcy Code. Nor does such an interpretation work any inequities upon unsecured creditors. Rusch, *Gerrymandering*, 63 U. Col. L.Rev. at 199 (observing that a restrictive approach to classification is not necessary to protect the interests of unsecured creditors as long as bankruptcy judges, as they are statutorily mandated to do, require plan proponents to comply with all applicable provisions of § 1129).

Concerns as to whether a proposed plan is abusive of the bankruptcy process can be addressed through the good faith requirement of § 1129(a)(3). Kenneth N. Klee, *Adjusting Chapter 11: Fine Tuning the Plan Process* (hereafter "*Adjusting Chapter 11*") 69 Am. Bankr. L.J. 551, 562–63 (Fall, 1995); Markell, *Clueless*, 11 Bankr.Dev. J. 38; Rusch, *Gerrymandering*, 63 U. Colo. L.Rev. at 204. Furthermore, before a plan can be crammed down, the proponent must demonstrate that the plan does not unfairly discriminate against and is fair and equita-

ble to any class that rejects it. *See ZRM–Oklahoma,* 156 B.R. at 71 (observing that concerns expressed by *Greystone III* and its progeny are adequately addressed through other provisions of the Code such as §§ 1129(a)(3), 1129(a)(7) & 1129(b)); *see also* Klee, *Adjusting Chapter 11,* 69 Am. Bankr.L.J. at 562; Markel, *Clueless,* 11 Bankr.Dev. J. at 43; Rusch, *Gerrymandering,* 63 U. Colo. L.Rev. at 200–01. Furthermore, we must presume that Congress carefully crafted the provisions of § 1129 with an eye toward ensuring that the reorganization process does not impose inequitable results upon the parties in involved. *Cf. Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) (stating that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code").

■ This discussion demonstrates why § 1122(a) should be interpreted in accordance with its plain language. That is, when faced with a classification objection, a court's only task should be to ascertain whether the claims within that class are substantially similar in character to each other. Though we do not repeat them here, we emphasize again the enormous practical benefits that would result from a proper construction of this section. For these reasons, should forthcoming appeals on this matter reach the Sixth Circuit, we would encourage the court to reconsider the "legitimate reason" standard established in *U.S. Truck.* Irrespective of whether the "legitimate reason" standard is correct, however, this Court is bound by *U.S. Truck* to apply it to the current § 1122(a) objections.

## C. Classification Objections of Class 4 Claimant

One Class 4 Claimant, Halcyon/Alan B. Slifka Management Company LLC and Halcyon Offshore Management Company LLC (collectively "Halcyon"), asserts that Class 4 claims are substantially similar to claims in Classes 4B and 16 and that the Proponents have failed to demonstrate a legitimate reason for classifying these claims separately.

■ Class 4B consists of all allowed DCC Guaranty Claims. DCC Guaranty Claims are those claims "arising with respect to guaranty agreements entered into between DCC and various lenders, guaranteeing certain of the financial obligations" of its subsidiaries. *Plan* § 1.43. These claims are plainly contingent because the Debtor will incur an obligation only upon the occurrence of an extrinsic event that may or may not take place—that is, the failure of one of its subsidiaries to perform its financial obligation to the guarantee lender. *See, e.g., In re Mazzeo,* 131 F.3d 295, 300 (2d Cir.1997) (defining a contingent claim as one that is dependent upon the happening of extrinsic event which may or may not occur). In contrast, claims in Class 4 are all noncontingent. Consequently, claims in Class 4 are of a different legal nature and character than claims in Class 4B, and it is therefore appropriate to classify such claims separately.

■ Class 16 is composed of all personal injury claims asserted against the Debtor by a shareholder-affiliated party. *Plan* §§ 1.116, 1.164, 5.13.6. Accordingly, Class 16 claims are derivative of claims of primary personal injury claimants. Since these are claims which assert personal injuries, the legal nature and character of Class 16 claims is substantially different from that of the commercial claims in Class 4. As a result, Class 4 claims are properly classified separately from the claims classified in Class 16.

## D. Classification Objections of Class 5 Claimants

Section 1122(a) objections were lodged by a small fraction of the approximately 137,500 domestic breast-implant claimants who filed claims against the Debtor. *Proponents' Exhibit 26.2.* Included within

this small fraction are about 45 claimants from the State of Nevada represented by the law firm of White & Meany (the "Nevada Claimants") whose claims are classified in Class 5. A few Class 5 claimants represented by Alan B. Morrison (the "Morrison Claimants") also objected to classification.

The Nevada Claimants contend that their claims are substantially different from those of other domestic breast-implant claimants as a result of the Nevada Supreme Court's decision in *Dow Chemical Co. v. Mahlum*, 114 Nev. 1468, 970 P.2d 98 (1998). In *Mahlum*, the plaintiff received a $4.2 million judgment against The Dow Chemical Company, a 50% owner of the shares of the Debtor. The verdict was based on a theory that Dow Chemical negligently undertook certain actions in connection with the Debtor's manufacture and sale of silicone-gel breast implants. *Id.* at 117–18.

The Nevada Claimants assert that *Mahlum* makes their claims substantially different in two ways. First, they assert that Dow Chemical is now collaterally estopped from relitigating the issue of liability in Nevada. Second, they argue that, unlike other Class 5 claimants, their claims cannot be subjected to a *Daubert*[7] hearing. They instead contend that their claims against the Debtor, even those that may ultimately be tried in federal court, would be subject to Nevada procedural law governing the admissibility of expert scientific testimony. *See Class Five Nevada Claimants' Reply Brief in Support of Memorandum of Law and Objections to Debtor's Amended Joint Plan of Reorganization* ("*Brief of Nevada Claimants*") at 19–21. They reason that while a federal court

usually applies federal law to procedural matters, it sometimes has the discretion to disregard federal law and apply state procedural law when doing so is necessary to avoid the "inequitable administration of . . . [the state's] substantive laws." *Id.* at 20. Apparently fearing that application of *Daubert* could lead to a less favorable result than was attained by the plaintiff in *Mahlum*, the Nevada Claimants assert that application of federal procedural law could negatively and impermissibly impact upon state substantive rights that only they have. From this they maintain that a federal court presiding over the trial of a Nevada Claimant would be free to apply that state's procedural law regarding the admissibility of scientific evidence.

Addressing the second argument first, a breast-implant claimant who chooses to litigate her claim against the Debtor will be subject to three potential trial venues: the federal district for the Eastern District of Michigan; the federal district court sitting in the district where the claim arose; or a state court in the state where the claim arose. The venue will be chosen at the discretion of the District Court.[8]

Should the trial of a litigating Nevada Claimant take place in federal court, that court would have jurisdiction over the claimant's state law tort claim. *See, e.g.,* 28 U.S.C. § 1334(a) & (b) (granting district courts "original and exclusive jurisdiction of all cases under title 11" and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11"). And it is widely recognized that the principles established by the Supreme Court in a line of cases beginning with *Erie R.R.*

7. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

8. If a personal injury claimant chooses to litigate her claim against the Debtor, the district court which presides over this case has the discretion to order that that claim "be tried in the [federal] district court in which the bankruptcy case is pending, or in the

[federal] district in which the claim arose." 28 U.S.C. § 157(b)(5). Under certain circumstances the district court also has the ability to abstain from having the breast-implant case heard in federal court, which would mean that the case would then be eligible to be tried in state court. 28 U.S.C. § 1334(c); *see also, e.g., In re Dow Corning Corp.*, 113 F.3d 565 (6th Cir.1997).

Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), while being developed within the framework of diversity litigation, apply with equal force in the context of other types of federal jurisdiction. *Mangold v. California Pub. Util. Comm'n.*, 67 F.3d 1470, 1478 (9th Cir.1995) (citing dicta to this effect in *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)); *Sayre v. Musicland Group, Inc.*, 850 F.2d 350, 352 (8th Cir.1988); *Maternally Yours v. Your Maternity Shop, Inc.*, 234 F.2d 538, 541 (2d Cir.1956) ("[T]he Erie doctrine applies, whatever the ground for federal jurisdiction, to any issue or claim that has its source in state law."); *In re The Elder–Beerman Stores Corp.*, 222 B.R. 309, 311 (Bankr.S.D.Ohio 1998); 17 *Moore's Federal Practice 3d* § 124.01[4]. In accordance with these principles, a federal court presiding over such a case would be required "to apply state substantive law and federal procedural law." *Hanna v. Plumer*, 380 U.S. 460, 465, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

■■■ The Nevada Claimants' assertion that federal courts are required to apply a federal rule of procedure *only* when that rule "directly conflicts with a state rule of procedure," *Reply Brief of Nevada Claimants* at 20, reads the Supreme Court's pronouncements in this area too narrowly. A federal court must apply a federal rule to a state claim if, "when fairly construed, the scope of [the federal rule] is 'sufficiently broad' to cause a 'direct collision' with the state law or, implicitly, to 'control the issue' before the court, thereby leaving no room for the operation of that law." *Burlington Northern R.R. Co. v. Woods*, 480 U.S. 1, 4–5, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987) (quoting *Walker v. Armco Steel Corp.*, 446 U.S. 740, 749–50, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980), *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 26, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988)). Thus, irrespective of whether a conflict exists, if the federal rule is "sufficiently broad ... to control the

issue before the court" and "if it represents a valid exercise of Congress' rule-making authority," the federal rule "must be applied." *Burlington Northern*, 480 U.S. at 5, 107 S.Ct. 967; *Stewart Organization*, 487 U.S. at 27, 108 S.Ct. 2239 ( "If Congress intended to reach the issue before the District Court, and if it enacted its intention into law in a manner that abides with the Constitution, that is the end of the matter; [f]ederal courts are bound to apply rules enacted by Congress with respect to matters ... over which it has legislative power." (internal quotations omitted)).

■■■ Federal Rule of Evidence 702, which speaks to the issue of when expert testimony is admissible, provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702. It is clear from the expansive language of this federal rule that its scope is "sufficiently broad" to cover any dispute regarding the admissibility of expert scientific or medical testimony regarding breast implants. And in fact, numerous cases have employed Rule 702 for just this purpose. *See, e.g., Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1309–1322 (11th Cir.1999); *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1124 (9th Cir.1994); *In re Breast Implant Litig.*, 11 F.Supp.2d 1217, 1221–22 (D.Colo. 1998). The Nevada Claimants do not dispute this point. Nor do they contend that Nevada's state rule of evidence on expert testimony, which contains terminology that is virtually identical to that found in Rule 702, is any greater in scope. *Brief of Nevada Claimants* at 20 ("The Nevada evidentiary rule concerning the testimony of expert witnesses is almost identical to the wording of the federal rule ..., the ... rules address the same issue, [and] they do not conflict.").

The next question is whether the Federal Rules of Evidence in general, and Rule 702 in particular, represent "a valid exercise of Congress' rulemaking authority." As the Supreme Court has observed, "Article III of the Constitution, augmented by the Necessary and Proper Clause of Article I, § 8, cl. 18, empowers Congress to ... establish procedural Rules governing litigation in [federal district and appellate courts] courts." *Burlington Northern*, 480 U.S. at 5 n. 3, 107 S.Ct. 967. For this reason, "Rules regulating matters indisputably procedural are *a priori* constitutional. Rules regulating matters 'which, though falling within the uncertain area between substance and procedure, are rationally capable of classification as either,' also satisfy this constitutional standard." *Id.* at 5, 107 S.Ct. 967. It is established that rules of evidence are "procedural in their nature." *Salsburg v. State of Maryland*, 346 U.S. 545, 550, 74 S.Ct. 280, 98 L.Ed. 281 (1954); *Brooks v. American Broadcasting Companies*, 999 F.2d 167, 173 (6th Cir.1993) ("The admissibility of expert testimony is a matter of federal ... procedure."); *McInnis v. A.M.F., Inc.*, 765 F.2d 240, 244 (1st Cir. 1985); *Stroud v. Cook*, 931 F.Supp. 733, 736 (D.Nev.1996) ("Rules of evidence are at least nominally rules which govern matter of procedure, rather than rules which allocate 'substantive rights.' "); *see also* Fed.R.Evid. § 101 ("These rules govern proceedings in the courts of the United States and before the United States bankruptcy judges and United States magistrate judges ...").

Without question, there are a few instances where federal courts will be required to apply a state evidentiary rule. For instance, the Federal Rules of Evidence specifically provide that when a state law claim is at issue, questions of privilege and competency "shall be determined in accordance with state law." Fed. R.Evid. §§ 501 and 601. In addition, a handful of state evidentiary rules have been found to be so intimately bound up with the state law cause of action as to actually be substantive in nature. 17 *Moore's Federal Practice 3d* § 124.09[2]. Examples of such state evidentiary rules include the parol evidence rule, rules permitting findings of medical malpractice panels to be admitted and state rules on burden of proof. *Id.* (and cases cited therein). The Nevada Claimants do not suggest that Rule 702 should be characterized as anything other than procedural. Rather, they complain that utilization of this federal rule could detrimentally affect their state law substantive rights. However, that this may occur does not bear upon the determination of whether Rule 702 would be applicable to their claims. As the Supreme Court has observed, "[t]o hold that a Federal Rule ... must cease to function whenever it alters the mode of enforcing state-created rights would be to disembowel ... the Constitution's grant of power over federal procedure." *Hanna*, 380 U.S. at 473–74, 85 S.Ct. 1136.

As these conclusions are fairly straightforward, it should come as no surprise that federal courts are virtually unanimous in their view that the Federal Rules of Evidence ordinarily govern the admissibility of evidence in cases involving state-law claims. *See, e.g.,* 17 *Moore's Federal Practice 3d* § 124.09[1] (and cases cited therein). Of particular significance is the fact that this is the view adopted by the Sixth and Ninth Circuits, the two possible federal court venues for litigating Nevada Claimants. *See Brooks*, 999 F.2d at 173; *Gibbs v. State Farm Mutual Ins. Co.*, 544 F.2d 423, 428 n. 2 (9th Cir.1976). Finally, courts uniformly recognize that questions concerning the admissibility of expert testimony are governed by federal law, not state law. *Brooks*, 999 F.2d at 173; *Clark v. Heidrick*, 150 F.3d 912, 914 (8th Cir.1998); *Cavallo v. Star Enter.*, 100 F.3d 1150, 1157 (4th Cir.1996); *Stutzman v. CRST, Inc.*, 997 F.2d 291, 296 (7th Cir. 1993); *Orth v. Emerson Elec. Co.*, 980 F.2d 632, 636 (10th Cir.1992). Therefore, a federal court presiding over the breast-im-

plant trial of a Nevada Claimant would not have the discretion to apply Nevada procedural law pertaining to the admissibility of expert testimony. Rather, it would be required to apply Rule 702 as interpreted by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); and *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The Nevada Claimants are not different from the other Class 5 claimants in this regard.

The Nevada Claimants' collateral estoppel argument is equally unpersuasive. Since the jury rendered its verdict in *Mahlum*, there have been new developments in science which tend to negate the case that silicone gel causes the diseases alleged by breast-implant claimants.[9] Counsel for the Nevada Claimants acknowledged during the confirmation hearing that should Dow Chemical once again become a defendant in a breast-implant trial in the State of Nevada, it would be entitled to present this new scientific evidence to the jury. Transcript, July 30, 1999 at 101 (statement of John White). Likewise if Dow Chemical found new fact witnesses tending to disassociate itself from the development and manufacture of the Debtor's product. Therefore, Dow Chemical would not be collaterally estopped from relitigating the issue of liability in Nevada state court.

But, for an entirely different reason too, the collateral estoppel issue is irrelevant to the question of whether the Plan properly classifies claims pursuant to § 1122(a). The Plan classifies claims filed against the Debtor, not its shareholders. As a result, it is the legal nature and character of the claims against the Debtor that guides the Court's inquiry with respect to § 1122(a). *See AOV Indus.*, 792 F.2d at 1151 ("The existence of a third-party guarantor does not change the nature of a claim vis-à-vis the bankruptcy estate and, therefore, is irrelevant to a determination of whether claims are 'substantially similar' for classification purposes.").[10]

The Morrison Claimants assert that it is improper to classify breast-implant claimants who have had multiple ruptures with claimants who have had only a single rupture. *Objections to Reorganization Plan of Breast–Implant Claimants Rita Altig and Others and Gel Claimant Christiane Clegg and Others* at 13. They reason that multiple-rupture claims are more valuable than, and are therefore not substantially similar to, single-rupture claims. *Id.* These assertions are unavailing. Even assuming that it were practical to identify which of the hundreds of thousands of women with Dow Corning breast implants have had more than one rupture, this objection is without merit.

To be substantially similar, claims need not be identical. 7 *Collier on Bankruptcy* ¶ 1122.03[3][a]. And there is certainly no requirement that claims be classified according to their values. *Cf. In re Resorts Int'l, Inc.*, 145 B.R. 412, 448 (Bankr.D.N.J.1990) (classification may be appropriate "even though some class member may have stronger claims, or stronger defenses than others."). As indicated, claims will be substantially similar if they are similar in legal nature or character. There is no question that Class 5 claimants

---

9. *See, e.g., Institute of Medicine Report: Safety of Silicone Breast-implants* (June 1999); *MDL 926 National Science Panel Report* (November 1998).

10. It is apparent that the Nevada Claimants' true concern is the complete release from future liability that the Plan proposes to provide to Dow Chemical. *See Class Five Nevada Claimant' Reply Brief in Support of Memorandum of Law and Objections to Debtor's Amend-* ed *Joint Plan of Reorganization* at 11 ("[B]ut for the Plan's release of Dow Chemical, the Nevada [Claimants] would have no significant problems with their classification."). However, the appropriateness of these releases is an issue which is separate and distinct from whether classification is proper. The issue of the releases will be addressed in a separate opinion.

meet this requirement. All Class 5 claims are held by domestic breast-implant claimants. They are all unsecured claims which are unliquidated and disputed. They all arise out of the Debtor's manufacture and sale of breast implants. All of the claimants used the Debtor's products in the same manner. And all such claims allege that the breast implants caused them or will cause them personal injuries. As a result, all Class 5 claims are substantially similar in legal character and are appropriately classified together.

### E. Classification Objections of Claimants in Classes 6.1 & 6.2

Classification objections were also filed by a number of foreign breast-implant claimants.[11] Almost all of these objectors assert that their claims should be placed in Class 5 and that the settlement offers extended to them under the Plan should be exactly the same in amount as those offered to domestic breast-implant claimants.

The New Zealand Claimants' justification for this position is based on a *forum non conveniens* argument. They note the Proponents' contention that separate classification is merited because there are rudimentary distinctions between the legal rights of foreign and domestic breast-implant claimants which warrant different treatment. *Objections of New Zealand Claimants to Amended Joint Plan of Reorganization* at 8. These legal differences allegedly stem from the fact that "[d]omestic [c]laimants can litigate their claims in [United States] courts, but the [f]oreign [c]laimants ... cannot." *Id.* This would mean that a breast-implant claimant from Germany, for instance, who chooses to litigate her claim would likely have her claim tried in a German court under German law. But the New Zealand Claimants profess to be differently situated than other Class 6.1 claimants in this respect. They insist that their claims would survive a *forum non conveniens* motion made by the Debtor and that, as a result, their claims would be tried in a United States court as opposed to a New Zealand court. In support of this position, they primarily rely on *Ashley v. Dow Corning Corp.* (*In re Silicone Gel Breast Implants Products Liability Litigation*), 887 F.Supp. 1469 (N.D.Ala.1995).

*Ashley* involved a *forum non conveniens* motion made by Dow Corning against approximately 151,194 breast-implant plaintiffs from Australia, Great Britain and Canada as well as 40 plaintiffs from New Zealand. *Id.* at 1471–72. The motion was granted with respect to all of the Australian, British and Canadian plaintiffs. *Id.* at 1478–79. However, the motion was denied as to an unspecified number of New Zealand plaintiffs whose claims met certain criteria. *Id.* at 1475.

A number of other objectors raise *forum non conveniens* arguments. The Brazilian Claimants contend that, irrespective of whether foreign claimants could survive a *forum non conveniens* motion, using this doctrine as one of the factors justifying separate classification is unfair and dis-

---

11. Among these objectors were the following Class 6.1 claimants: certain New Zealand claimants represented by Charles Wolfson (the "New Zealand Claimants"); certain Australian claimants represented by Cashman & Partners and Hopkins & Sutter (the "Australian Claimants"); certain Netherlands claimants represented by John T. Johnston (the "Netherlands Claimants"); and approximately 250 claimants represented by Sybil Shainwald, P.C. who are citizens of either Belgium, Canada, France, Germany, Italy, Ireland, Netherlands, New Zealand or Switzerland (the "Shainwald Claimants").

The Class 6.2 claimants who objected to classification are: a small number of claimants from Argentina, Israel and South Africa who are likewise represented by Sybil Shainwald, P.C. (and who are also referred to as the "Shainwald Claimants"); certain Brazilian claimants represented by David J. Hutchinson and Fernando Vergueiro (the "Brazilian Claimants"); South Korean claimants represented by Yeon–Ho Kim (the "South Korean Claimants"); and certain South African claimants represented by the Sibley Law Firm (the "South African Claimants").

criminatory. *Objections of Certain Brazilian Claimants* at 2. And in any case, they argue that consideration of the traditional *forum non conveniens* factors suggests that their claims would likely survive such a motion. *Id.* at 3–7.

The Shainwald Claimants concur with this view, but also add another twist. They argue that since the Supreme Court's decision in *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981), a court faced with a *forum non conveniens* motion must also consider the impact of any existing treaty of Friendship, Commerce and Navigation ("FCN treaty") between the United States and the country in question. *Objections of Shainwald Claimants* at 21. And the impact of these treaties, according to the Shainwald Claimants, is that similarly-situated foreigners and nationals must be afforded equal access to the courts of the country where the legal proceeding is taking place. *See Id.* at 23 (quoting from Article VI ¶ 1 and Article XXV ¶ 1 of the FCN treaty between the United States and Germany dated October 29, 1954: A similarly situated foreign party must be accorded treatment which is both "fair and equitable" and on "terms no less favorable than the treatment accorded . . . to nationals."); *see also Objections of The Netherlands Claimants* at 6–8 & n. 4 (quoting from the FCN treaty between The Netherlands and the United States: "Nationals and companies of either Party shall be accorded national treatment with respect to access to the courts of justice and to administrative tribunals and agencies within the territories of the Other Party.").

The Shainwald Claimants assert that the separate classification, and the disparate treatment which is part and parcel with such classification under the Plan, violates the FCN treaties in the following manner. The Plan provides the Litigation Facility Administrators discretion to seek dismissal of foreign claims pursuant to the doctrine of *forum non conveniens. Amended Joint Plan* ¶ 5.12. However, no such discretion

is provided with respect to domestic breast-implant claimants. Thus, the separate classification leads to unequal treatment and violates the FCN treaties. *Objections of the Shainwald Claimants* at 24; *Objections of The Netherlands Claimants* at 8.

But the Shainwald Claimants do not rest there. They maintain that, irrespective of whether their claims could survive a *forum non conveniens* motion and regardless of the impact of the FCN treaties, the Proponents have failed to justify what they perceive to be the unfairly discriminatory treatment of their claims. The Australian and South African Claimants also make this objection. As a result, these objectors argue that the Proponents have not demonstrated a legitimate reason for separately classifying their claims from domestic breast-implant claims.

The Australian Claimants insist that there are no meaningful differences between the fundamental legal rights of Australian claimants and domestic claimants. Under Australian choice-of-law rules, they argue, an Australian court presiding over a breast-implant trial would apply U.S. law. And even if the Australian court did not do this, from a breast-implant claimant's perspective, Australian tort law is just as favorable as U.S. law. *Objections of Australian Claimants* at 2. South African Claimants made a similar objection. *Objections by South African Claimants* at 1. The Shainwald Claimants seem to argue that even if there are meaningful differences between the substantive legal rights of foreign and domestic claimants, that the Proponents have failed to sufficiently articulate what those legal differences are. *Objections of the Shainwald Claimants* at 17.

These objectors also attempt to debunk the Proponents' assertion that economic considerations (i.e. each country's per capita GDP) provide additional support for separate classification. *Objections of Australian Claimants* at 2; and *Objections of*

the *Shainwald Claimants* at 17–19; *Objections of South African Claimants* at 2.

The Australian Claimants further contend that there is no applicable legal precedent supporting the Plan's classification scheme. *Objection of Australian Claimants* at 3. And after asserting that all breast-implant claims should be classified together, *Memorandum of Law of Australian Claimants* at 11, the Australian Claimants, somewhat contradictorily, complain that their claims are not substantially similar to and are therefore improperly classified with the claims of certain non-Australian Class 6.1 claimants. *Objections of Australian Claimants* at 3.

Two more points are raised by the Shainwald Claimants. They note that the Plan classifies United States citizens who live in foreign countries and who received implants outside of the Greater U.S. in Class 5. *Objections of the Shainwald Claimants* at 17. According to the Shainwald Claimants, the Proponents have not adequately explained why these claimants are appropriately placed in a class separate from similarly situated foreign claimants. *Id.* Lastly, the Shainwald Claimants assert that it is improper to separately classify certain Canadian claimants in Classes 6A, 6B and 6C and certain Australian Claimants in Class 6D because such classification is, in some unexplained way, not "based on the interest of the claimants themselves." *Id.* at 20.

The final objection to account for was made by the South Korean Claimants. These claimants do not *per se* object to the separate classification of foreign and domestic claimants. Their complaint is with the fact that the Plan suggests that their claims fall within Class 6.2. In their view, South Korea's per capita GDP, which is about 53% of the United States per capita GDP, is sufficient to merit their inclusion in Class 6.1. *Objection of South Korean Claimants* at 1–2.

We begin by noting a fairly obvious point upon which there is virtually no disagreement: all breast-implant claims, both domestic and foreign, are substantially similar. All are unsecured, unliquidated and disputed tort claims arising out of the Debtor's sale and manufacture of silicone-gel breast implants. All such claimants allege that the breast implants caused or will cause them personal injuries.

Moreover, the claims within each class of breast-implant claims are substantially similar in legal nature and character. In addition to the common characteristics noted above, claims within each class possess certain other characteristics that are unique to that class. For instance, Class 5 claimants are all citizens of the United States or residents of the Greater U.S. All Class 6.1 claimants are residents of countries that either: belong to the European Union, have a common law tort system, or have a per capita GDP that is greater than 60% of the United States' per capita GDP. And all Class 6.2 claimants are residents of countries that: do not belong to the European Union; do not have a common law tort system; and do not have a per capita GDP that is greater than 60% of the United States' per capita GDP.

The real question is whether there is a legitimate reason for classifying breast-implant claims in three separate classes. As explained below, the answer to this question is yes.

In reaching this conclusion the Court need not determine, as urged by The Netherlands Claimants, whether the proposed settlement offers to foreign claimants satisfies the fair, adequate and reasonable requirements of Federal Rule of Civil Procedure 23(e). *Objections of Netherlands Claimants* at 6 (citing *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1147 (11th Cir.1983)). Quite simply, this is a bankruptcy case and the Court's decision is governed, not by the rules of class action proceedings, but by the requirements of the Bankruptcy Code.

Nor is it necessary for the Court to determine whether the settlement offers in question are unfairly discriminatory to-

ward foreign claimants. The conditions of § 1129(a) must be satisfied before a plan can be confirmed. But that section does not contain a requirement that a plan not discriminate unfairly against a particular class of creditors. Rather, that issue arises only when an impaired class has rejected a proposed plan, thereby triggering the cramdown requirements under § 1129(b). 11 U.S.C. § 1129(b)(1) (A plan which meets all conditions of § 1129(a), save § 1129(a)(8), can be confirmed only if the court finds that the plan "does not discriminate unfairly" against the rejecting, impaired class.).

▮ A class has accepted a plan if its members vote to accept the plan by more than one-half in number and two-thirds in amount. 11 U.S.C. § 1126(c). In this case, the Court temporarily allowed all breast-implant claims at an equal value for purposes of voting.[12] To be an accepting class of breast-implant claims then, at least 66 2/3% of that class' members needed to vote in favor of the Plan. Class 6.1 voted to accept the Plan by a margin of 78.9% in number (and therefore in amount). As a result, unfair discrimination was never an issue with respect to their claims. Class

6.2 initially garnered acceptance of only 65.8%. So when the confirmation hearing began, unfair discrimination was an arrow in the Class 6.2 claimants' quiver. During the confirmation hearing, however, a proposed plan modification affecting their claims was accepted by a number of formerly rejecting Class 6.2 claimants. *See In re Dow Corning Corp.*, 237 B.R. 374 (Bankr.E.D.Mich.1999). Consequently, Class 6.2 is now an accepting class. *Id.* at 380. Therefore, whether the Plan unfairly discriminates against Class 6.2 claimants is no longer an issue. For these reasons, it is not necessary to decide the fairness of the proposed settlement offers to foreign breast-implant claimants.

Nonetheless, it merits noting that the Proponents presented overwhelming evidence tending to show that the costs of resolving tort claims in foreign legal systems is such that the settlement offers contained in the Plan are neither unfair, unreasonable nor discriminatory. The Proponents' chief evidence on this regard was the testimony of three expert witnesses: Professor Basil Markesinis,[13] Mr. Augustus Ullstein[14] and Professor Harold

12. The valuation of one unit per claim for voting purposes was subject to reconsideration on motion by an affected claimant. No breast-implant claimant has filed such a motion.

13. Professor Markesinis is a professor of law at the University of Oxford in England, the University of Leiden in The Netherlands and the University of Texas School of Law. He holds chairmanships at each of these institutions and his areas of instruction include comparative law, comparative methodologies, tort law and European law. In addition, to holding seven Ph.D.'s (four earned and three honorary), Professor Markesinis is a Fellow of the British Academy, a Corresponding Fellow of the Royal Belgian Academy, a Fellow of the Academy of Athens, a Foreign Fellow of the Royal Dutch Academy and a Member of the American Law Institute. He is an expert in the tort systems of each of the major legal systems of Europe (Germanic, English and Romanesque/French) and is well versed on how those tort systems have spread to and been implemented by countries in virtually every part of the world (i.e. United States,

Central and South America, Japan, Africa etc.). Professor Markesinis has authored approximately 20 books and over 100 legal articles, most of which pertain in some manner to comparative law. Finally, he served as a member of a panel appointed by United States District Judge Speigel (the *"Pfizer* Foreign Fracture Panel"), that was charged with determining fair settlement levels for foreign tort claimants in the class action case of *Bowling v. Pfizer*, No. C–1–91–256 (S.D.Ohio 1995). *See* Proponent's Exhibit 22, Curriculum vitae of Professor Basil Markesinis; *see also Transcript*, June 30, 1999 at 271–86; *Transcript*, July 1, 1999 at 11–43.

14. Mr. Augustus Ullstein is a Queen's Counsel and practicing barrister in the United Kingdom. In addition to specializing in products liability litigation in England, Mr. Ullstein is knowledgeable on tort systems and verdict values in the United Kingdom, Germany, The Netherlands and South Africa. Like Professor Markesinis, he also served on the *Pfizer* Foreign Fracture Panel. *See also* Proponents' Exhibit 23, Curriculum vitae for Augustus Ullstein; *Transcript*, July 1, 1999 at 288–292.

Luntz.[15]

The conclusions offered by Professor Markesinis can be set forth rather summarily. He testified that there are a number of legal, economic, cultural and miscellaneous factors[16] which tend to cause tort recoveries in foreign legal systems to be markedly lower than tort recoveries in the United States. *Transcript*, July 1, 1999 at 12–41. For this reason, he believes it is appropriate for the Plan to differentiate between foreign and domestic breast-implant claimants. Professor Markesinis also testified that these same factors provide a reasonable and fair basis for further differentiating between the claimants in Classes 6.1 and 6.2.[17]

Mr. Ullstein testified that a woman bringing a breast-implant case in either the United Kingdom, Germany, The Netherlands or South Africa would face substantial legal and procedural obstacles that would not be present in the United States. Therefore, he concluded that the settlement offers extended to foreign breast-implant claimants under the Plan are fair in relation to those extended to domestic claimants.

Professor Luntz similarly opined that, based upon his knowledge of tort damage awards in Australia and New Zealand, the settlement offers extended under the Plan to breast-implant claimants are more than fair and reasonable.[18]

Through long hours of cross-examination, the foreign objectors doggedly, though ultimately unsuccessfully, attempted to cast doubt upon the testimony by the Proponents' witnesses. The foreign objectors' witnesses were also unhelpful in this regard. For instance, the Shainwald Claimants presented the testimony of Edward Kellogg.[19] It was apparent on cross-examination that Mr. Kellogg has minimal practice experience in the English tort system, *Transcript*, July 15, 1999 at 86–89, and minimal knowledge of average recov-

15. Professor Luntz, a professor of law at the University of Melbourne in Australia, is an expert in the tort systems and damage awards of both Australia and New Zealand. He is the author of a number of books and articles on tort law, including the leading torts textbook in Australia and "Assessment of Damages for Personal Injury and Death." As part of his preparation for updating this latter book, now in its fourth edition, Professor Luntz stays current on developments in tort law in the United States. *Transcript*, July 2, 1999 at 63. He is the editor of the Torts Law Journal in Australia and was a member of the *Pfizer* Foreign Fracture Panel. *See also* Proponents' Exhibit 24, Curriculum vitae for Harold Luntz; *Transcript*, July 2, 1999 at 59–63.

16. These factors include: the availability of strong social security system payments in foreign countries; that most tort cases in foreign countries are tried by judges, not juries; that punitive damages are typically not available in foreign countries or are available in only limited instances; that foreign countries lack American-style contingency fees; that foreign countries exhibit lower tort awards, and different, less plaintiff-friendly standards of liability; that cultural factors in foreign countries lead to a diminished propensity to litigate; that more plaintiffs proceed in foreign countries on a *pro se* basis; and that significant weight is given in foreign countries to semi-official medical reports completed at the direction of the government. *See Transcript*, July 1, 1999 at 12–41.

17. For the complete testimony of Professor Markesinis, *see Transcript*, June 30, 1999 at 271–86 and *Transcript*, July 1, 1999 at 11–273.

18. Like Professor Markesinis, Professor Luntz stated that there are a number of factors which lead to this result. They are: Australians tend to be less litigious; certain social benefits, such as universal health care, which are not available in United States are available in Australia; litigation costs rules are a significant deterrent to lawsuits; judges, not juries, usually decide product liability cases; strict liability is less frequently available in Australia than in the United States; damage awards in Australia and New Zealand are lower than in the United States; and punitive damages are rarely available. For the complete testimony of Professor Luntz, *see Transcript*, July 2, 1999 at 59–145.

19. Mr. Kellogg is a practicing attorney in Atlanta, Georgia specializing in pharmaceutical products liability cases. In addition to being a member of the Georgia bar, he is admitted to the British bar as a barrister. *See Transcript*, July 15, 1999 at 13–19.

ery amounts in the English tort system. *Id.* at 92–94. But more importantly, and despite the noted limitations on his expertise, implicit within his testimony was an acknowledgment that tort values in the United States do indeed tend to be considerably higher than those in England. *Id.* at 94–103.

The Australian Claimants proffered the testimony of Professor David Partlett.[20] Though Professor Partlett testified that substantial differences did not exist between tort values in the United States and Australia, he nevertheless agreed with many of the differentiating factors identified by Professor Luntz. *Transcript,* July 14, 1999 at 220–38. His concurrence with Professor Luntz was bolstered by reference to a law review article which he co-authored and in which he reiterated his agreement with many of those differentiating factors. *Id.* at 238–43 (discussing Jeffery O'Connell and David F. Partlett, *An America's Cup for Tort Reform? Australia and America Compared,* 21 U. Mich. J.L. Ref. 443 (1988)). In this article, in fact, Professor Partlett went so far as to refer to Australia's tort system as a "defendant's pleasure dome." *Id.* at 243; *An America's Cup for Tort Reform?* at 457. Not surprisingly, Professor Partlett made no attempt to similarly characterize the United States' tort system.

■ Without question, the evidence on the record shows that tort recoveries in the United States tend to be significantly higher than those in foreign jurisdictions. The record further shows that it is appropriate to differentiate, as the Plan does, between categories of foreign claimants on this basis. There is, in fact, little dispute among the legal community over the cor-

rectness of these basic propositions. *Piper Aircraft Co.,* 454 U.S. at 252 & n. 18, 102 S.Ct. 252 (observing that American courts are very attractive to foreign plaintiffs); *Bhatnagar v. Surrendra Overseas Ltd.,* 52 F.3d 1220, 1235 (3d Cir.1995); *Reid–Walen v. Hansen,* 933 F.2d 1390, 1409 (8th Cir.1991) (Timbers, J., dissenting); *Coakes v. Arabian Am. Oil Co.,* 831 F.2d 572, 576 (5th Cir.1987); *MGN Pension Trustees v. Morgan Stanley Trust Co.,* 947 F.Supp. 611, 617 (E.D.N.Y.1996); *see also* Howard M. McCormack, *Uniformity of Maritime Law, History, and Perspective from the U.S. Point of View,* 73 Tul. L.Rev. 1481, 1506 (1999); Douglas W. Dunham & Eric F. Gladbach, *Forum Non Conveniens and Foreign Plaintiffs in the 1990's,* 24 Brook. J. Int'l L. 665, 666 (1999).

The Court emphasizes once again that both classes of foreign breast-implant claimants voted to accept the Plan and that it is, therefore, not necessary for the Plan to satisfy the cramdown requirements of § 1129(b). And again, this means that the issue of whether the settlement offers extended to foreign claimants are fair is not at issue in this case. Were we required to decide this issue, however, the evidence demonstrates that the Plan easily passes muster in this respect.

Through use of the *forum non conveniens* doctrine, the objecting foreign breast-implant claimants have attempted to show that there is not a legitimate reason for classifying their claims separately from domestic claims. After all, if a foreign claimant is able to survive a motion to dismiss based on *forum non conveniens,* the claimant's case would likely be tried in federal court in the Eastern District of

---

20. Professor Partlett originally hails from Australia where he taught at the Australian National University in Canberra, Australia for nine years. Prior to that he was the principal law reform officer of the Australian Law Reform Commission. For the past 14 years he has been a professor of law at Vanderbilt University Law School. He teaches advanced torts and remedies and has taught courses in areas such as comparative law and health law. Professor Partlett has also published books and articles on a variety of topics including professional negligence, child mental health and the law, medical malpractice, punitive damages and repressed memories. Australian Claimants' Exhibit 1, Curriculum vitae for David Frederick Partlett; *Transcript of Hearing,* July 14, 1999 at 151–56.

Michigan. And according to the foreign objectors, the law which would then govern would be the law of the State of Michigan. Under such circumstances, differences in substantive legal rights between domestic and foreign claimants should no longer be a factor justifying the separate classification of such claims.[21]

In any event, most, if not all, of the foreign claims would likely be subject to *forum non conveniens* dismissal. *See, e.g., Ashley,* 887 F.Supp. 1469 (granting Dow Corning's *forum non conveniens* motion as to 151,194 Australian, Canadian and British breast-implant plaintiffs). *See also Piper Aircraft,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (discussing factors to be considered when deciding *forum non conveniens* motion); *Gschwind v. Cessna Aircraft Co.,* 161 F.3d 602 (10th Cir.1998); *Torres v. Southern Peru Copper Corp.,* 113 F.3d 540 (5th Cir.1997); *Magnin v. Teledyne Continental Motors* 91 F.3d 1424 (11th Cir.1996); *but see Bhatnagar,* 52 F.3d 1220 (holding that extreme delay in the alternative forum can render that forum inadequate). Thus far, the only foreign breast-implant claimants who have survived a motion to dismiss in federal court based on *forum non conveniens* were the unspecified number of New Zealand claimants in *Ashley.* And even these

claimants' ultimate fate on the matter is unknown. While the court denied the motion to dismiss, it was done "without prejudice to resubmission if factually warranted." *Ashley,* 887 F.Supp. at 1478.

 In addition, if any foreign claimants would happen to survive a *forum non conveniens* motion, they would still face substantial choice-of-law hurdles. Contrary to the assertions made by some of the foreign objectors, case law suggests that resolution of their claims in such a situation would be governed, not by the law of the State of Michigan, but by the law of the country where the claimant is a citizen. To resolve whether an action is governed by Michigan law or the law of a foreign jurisdiction, "a federal court whose jurisdiction is based on diversity of citizenship must apply the conflict of law rules of the forum state." *Johnson v. Ventra Group, Inc.,* 191 F.3d 732, 738 (6th Cir. 1999). *See also Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 490, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).[22] When confronted with a choice-of-law question, Michigan courts use an "interest analysis" to ascertain which jurisdiction's law should apply. *Sutherland v. Kennington Truck Serv., Ltd.,* 454 Mich. 274, 278–86, 562 N.W.2d 466 (1997); *Hall v. General Motors Corp.,* 229 Mich.App. 580, 585, 582

---

21. That a number of the foreign objectors relied so heavily on the *forum non conveniens* issue is interesting, for such reliance almost carries with it an implicit admission that substantive differences in legal rights between foreign and domestic claimants are material to the level of settlement offers made. Otherwise, counsel for these claimants would not be expressing such a strong preference for having their clients' cases tried in the United States. *Cf., e.g.,* Joann S. Lublin, *Bain Loses Round in Battle With Rival Claiming Raid and Data Theft in Brazil,* THE WALL STREET JOURNAL, July 7, 1999, at B8 (An Italian company with a consulting operation in Brazil sued a Boston-based company in New York federal court for harm it had allegedly caused to the Brazilian operation. The New York court dismissed the case on *forum non conveniens.* Rather than sue in Italy or Brazil, the Italian company re-filed the lawsuit in federal court in Boston.).

22. Although the district court would be exercising its bankruptcy jurisdiction, 28 U.S.C. § 1334(a), and not its diversity jurisdiction, 28 U.S.C. § 1332, the result in this case ought not be different. This statement is, perhaps, an oversimplification of what actually takes place in a bankruptcy proceeding. As noted above, a federal court sitting in diversity will apply the forum state's choice of law rules. In contrast, some courts have held that a court sitting in bankruptcy must apply the choice of law rules of the state with which the parties have the most significant contacts. *See, e.g., Limor v. Weinstein & Sutton (In re SMEC, Inc.),* 160 B.R. 86, 90–91 (M.D.Tenn. 1993). However, in this case, Michigan's choice of law rules would be the only one available to apply.

N.W.2d 866 (1998). First, the court determines whether the foreign jurisdiction has an interest in having its law applied. *Sutherland,* 454 Mich. at 286, 562 N.W.2d 466. If it does not, Michigan law will apply. If the foreign jurisdiction does have an interest in having its law applied, the court must determine whether Michigan's interest is substantial enough to nevertheless mandate the application of its own law. *Id.*

In *Hall,* the court had to determine whether to implement Michigan law or North Carolina law. Even though the plaintiff was barred from filing suit in North Carolina due to the statute of limitations, the court nonetheless concluded that North Carolina had an interest in having its law applied. The court observed that the plaintiff had the following connections to the state of North Carolina: he lived and worked there and was employed by a company located in the state; his injury occurred there and was caused by a vehicle owned, licensed and insured in the state; and he received medical treatment at a hospital located in the state. *Hall,* 229 Mich.App. at 585–86. For these reasons, the court concluded that "North Carolina ... obviously has an interest in applying its law to [the] dispute." *Id.* at 586. The court further noted that this interest was heightened by a foreign jurisdiction's clear interest in establishing and applying product liability laws that encourage manufacturers to do business there. *Id.* at 586–87. In contrast, Michigan had little interest in applying its own law to the situation: " 'Michigan has no interest in affording greater rights of tort recovery to a North Carolina resident than those afforded by North Carolina.' " *Id.* at 587 (quoting *Farrell v. Ford Motor Co.,* 199 Mich.App. 81, 501 N.W.2d 567 (1993)). Were these same considerations to be applied to a litigating foreign breast-implant claim that has overcome a *forum non conveniens* motion, it seems unlikely that the result would differ from the one in *Hall.*

This leaves the matter of the FCN treaties. The Shainwald Claimants make too much of the treaties' impact. As one commentator has stated: "[I]n any forum non conveniens inquiry with a foreign plaintiff, a FCN treaty may exist that could compel the court to apply the same standard to that foreign plaintiff as would apply to a United States plaintiff." Allan Jay Stevenson, *Forum Non Conveniens and Equal Access Under Friendship, Commerce, and Navigation Treaties: A Foreign Plaintiff's Rights,* 13 Hastings Int'l & Comp. L.Rev. 267, 283 (1990). All that is indicated by this comment is that if a *forum non conveniens* motion is filed against a litigating foreign claimant in this case, the district court may be compelled to apply the same standards and factors that would apply to a similar motion made against a domestic claimant. There is nothing in the law to suggest that these treaties necessarily preclude the granting of a motion to dismiss based on *forum non conveniens.* Nor is there anything to suggest that the treaties are violated if a defendant brings a *forum non conveniens* motion against a foreign plaintiff but does not bring such a motion against a similarly-situated domestic plaintiff.

The Plan merely preserves the Debtor's (or more accurately the Litigation Facility's) ability to pursue procedural rights that it would possess outside of bankruptcy. Should the Litigation Facility so decide, these procedural rights could be pursued before the District Court against foreign claimants who choose to litigate their claims. There is nothing improper about the Plan in this respect. And, of course, in this there is a real difference between foreign and domestic claimants. Foreign claimants bear a considerable risk of having their claims dismissed from United States' courts based on *forum non conveniens;* domestic claimants do not. In the off chance that a foreign claimant would be able to get past such a motion, the law of her home jurisdiction would likely apply to the resolution of her claim. These considerations show that there are

indeed legitimate reasons for classifying foreign breast-implant claims separately from domestic claims: there are most definitely significant differences between the procedural rights of foreign and domestic breast-implant claimants, and there appear to be substantial differences between the substantive legal rights of such claimants as well.

There is another reason that the Plan's classification of foreign breast-implant claimants is appropriate. A settlement is a private agreement voluntarily reached between parties to a dispute that legally resolves their differences. *Black's Law Dictionary* 1377 (7th ed.1999). Since it is a private agreement, the parties are free to settle on terms of their choosing. The fact that the settlement offer contained in the Plan is more or less a "take-it-or-leave-it" proposal does not in any way make it improper or illegal. Quite simply, a court cannot tell a chapter 11 debtor how much it should offer to settle pending personal injury claims. If the foreign objectors find the terms of the Debtor's offer unacceptable they are free to reject it and to litigate their claims instead.

The Debtor made a considered judgment as to what settlement amounts the various breast-implant claimants would accept in resolution of their claims. In ascertaining these amounts, the Debtor relied on a number of factors such as differences in substantive and procedural legal rights and differences in economic conditions. There is nothing arbitrary, unreasonable or irrational about using such factors for this purpose. After all, settlement offers are always driven by projected litigation outcomes. If the projections turn out to be incorrect, the Debtor will have fewer takers. But the fact that, in the Debtor's judgment, different breast-implant claims warrant different settlement offers is a perfectly "legitimate reason" to classify those claims

separately. For all of the reasons expressed, the Court concludes that the Plan's classification of foreign claims complies with § 1122(a).

## F. Classification Objections of Class 12 Claimants

The Official Committee of Physician Claimants ("PCC") and about 50 physician claimants represented by Hartley Hampton objected to the fact that the Plan classifies both direct and derivative Physician Claims in Class 12.[23] This classification is improper, they argue, because the two types of claims "differ in character." *Memorandum of Law of the PCC* at 57. As noted *supra* p. 6, a Physician Direct Claim alleges that the holder of such a claim was injured as a result of fraudulent misrepresentations made by the Debtor in connection with its manufacture and sale of breast-implants and other medical products to that physician. A Physician Derivative Claim, on the other hand, merely seeks indemnification in the event the holder of such a claim is found liable to a patient or a patient's spouse for injuries allegedly caused by a Dow Corning product that the physician implanted in a primary implant claimant.

Further evidence of what the PCC dubs Class 12's lack of "homogeneity" stems from their belief that the Plan provides unequal treatment to physician claimants who assert both types of claims. The Plan, as indicated, tenders the same settlement offer to all physician claimants. The PCC states that "a class is not homogenous when certain class members must give up greater consideration for the same treatment accorded to other members of the same class." *Id.* at 58. This argument misses its mark. The issue of whether all claims within a class are receiving the same treatment is a matter that is separate and distinct from whether such claims are substantially similar to one

---

**23.** The objections made by the PCC and Hartley Hampton were identical. For the sake of simplicity, the Court will refer only to the PCC throughout the remainder of this opinion.

another. The treatment issue arises only in the context of § 1123(a)(4) and will be addressed accordingly.

The PCC then asserts that the Plan's classification scheme is improper because it is "designed to manipulate [Class 12] voting." *Id.* at 59 (quoting *Holywell Corp.*, 913 F.2d at 880). Few physician claimants have expressed an intent to assert a Physician Direct Claim. According to the PCC, physician claimants who have not expressed such an intent are more likely to accept the Plan than those who have. *Memorandum of Law of the PCC* at 59–60. And the voting results do appear to support this supposition, for physician claimants overwhelmingly accepted the Plan by a margin of 91.4%. As a result, the PCC contends that the Plan effectively disenfranchises claimants holding Physician Direct Claims. *Id.* at 59.

■■■ Once again, the PCC's classification argument is off target. It may well be that one of Congress' primary motivations for limiting class membership to substantially similar claims was, as the PCC states, to ensure "that the votes cast by the class will reflect the joint interests of the class." *Id.* (quoting *In re Huckabee Auto. Co.*, 33 B.R. 141, 148 (Bankr.M.D.Ga. 1981)). But to accomplish this goal, Congress enacted a single requirement, which is that a class may consist only of substantially similar claims. When determining whether claims within a single class meet this requirement, assertions of attempted vote gerrymandering are simply irrelevant. If all claims within a class are substantially similar, then the class is properly constituted. If all claims within a class are not substantially similar, then the classification violates § 1122(a). Consequently, accusations that a classification scheme has been designed to gerrymander the vote on a proposed plan need be addressed, it at

all, only when the plan proponent has placed substantially similar claims in separate classes. *See U.S. Truck*, 800 F.2d 581; *Greystone III*, 995 F.2d at 1274. *But see supra* Part II.B (postulating that vote gerrymandering should not be an issue with respect to whether claim classification is proper). That, of course, is not the case with physician claims which are all classified in a single class, Class 12.

■■ Thus, when the smoke clears from the PCC's classification rhetoric there is still but one question for the Court to answer: are all the claims in Class 12 substantially similar? We conclude that they are.[24]

All of the physician claims, whether they are direct or merely derivative, are nonpriority, unliquidated and disputed unsecured claims. They are all claims held by physicians who, in the course of providing medical services to patients, utilized silicone-gel breast implants and/or other medical products either manufactured and sold by the Debtor or containing components or materials supplied by the Debtor. All such claims arise, in some form or another, out of the physician claimant's use of such medical products. Thus all such claims arise out of a similar fact pattern and context. In short, the physician claimants whose claims are classified in Class 12 form a subgroup which shares characteristics that are unique among the Debtor's creditors as a whole. *See also In re Dow Corning Corp.*, 194 B.R. 121, 144–46 (Bankr.E.D.Mich.1996), *rev'd in part on other grounds*, 212 B.R. 258 (E.D.Mich. 1997) (appointing official committee to represent interests of all physician claimants).

Moreover, the PCC makes too much of any differences that may exist between derivative and direct claims. After all, every physician claimant potentially could have, even now, both a direct and deriva-

24. The PCC also argued that the Plan violates § 1123(a)(1) because it classifies physician creditors and not physician claims. *See* 11 U.S.C. § 1123(a)(1) (stating that "a plan shall ... designate ... classes of claims"). That

this objection is without merit seems patently obvious on its face. It is disposed of entirely, however, by the above conclusion that all physician claims are substantially similar and are appropriately classified.

tive claim against the Debtor. At this point there is no way to know, however, because proofs of claim need not identify the causes of action that the creditor would assert should litigation actually be required. For these reasons, it was logical and appropriate for the Proponents to classify all physician claims together.

## III. Within–Class Treatment of Claims Under the Plan

■■■■ Section 1123(a)(4) requires that a plan of reorganization "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment." 11 U.S.C. § 1123(a)(4). Assertions that the Plan does not satisfy this provision were made by: the Morrison Claimants with respect to Class 5; the New Zealand Claimants with respect to Classes 6.1 and 7; the PCC concerning Class 12;[25] and the United States concerning its claims in Class 15. As the Court has noted, all breast-implant claims are, in some respects, substantially similar. The Shainwald Claimants state that "[a] fundamental premise of the Bankruptcy Code is that there must be equality of distribution to similarly situated creditors." *Objections of the Shainwald Claimants* at 14. Since the Plan provides different treatment to domestic breast-implant claims than it does to foreign breast-implant claims, the Shainwald Claimants assert that § 1123(a)(4) is violated. The Australian Claimants similarly argue that § 1123(a)(4) requires that Australian claims in Class 6.1 and Australian claims in Class 6D receive the same treatment since, after all, all such claims are substantially similar. *Memorandum of Law of the Australian Claimants* at 15. Both of these objections misconstrue the import of § 1123(a)(4). This provision of the Code pertains only to the treatment of claims *within the same class*. It does not require that claims legitimately classified in separate classes receive the same treatment.

Whether it is appropriate for a proposed plan to provide different treatment to claims which are legitimately classified in separate classes will arise, if at all, in the context of cramdown. *See* 11 U.S.C. § 1129(b) (providing that a plan can be crammed down only if it does not unfairly discriminate against a rejecting class of creditors).

### A. Treatment Objections of Class 4 Claimant

Halcyon's § 1123(a)(4) objection is entirely dependent upon its classification objection. It reasons that Class 4 claims are substantially similar to, and should therefore receive the same treatment as, Class 4B and Class 16 claims. There is no need to address the more absurd aspects of Halcyon's treatment objection—whereas Class 4 claims are being paid in full with interest, Class 4B claims will receive no distribution except in the event of an unlikely contingency, and many of the Class 16 claims are being released for non-cash consideration. The Court has overruled Halcyon's classification objection. As a result, the Court need look only to the treatment provided to claimants within Class 4. And on this point, there is no dispute that all claims within Class 4 receive the same treatment. Halcyon's § 1123(a)(4) objection is therefore overruled.

### B. Treatment Objections of Certain Claimants in Classes 5, 6.1 and 12

The objectors with claims in Classes 5, 6.1 and 12 assert that the Plan fails to comply with § 1123(a)(4) because, in exchange for the same treatment from the Debtor, certain of the claimants are required to provide more valuable consideration than the other members of the class. For instance, the PCC acknowledges that every physician claim is extended the same settlement offer under the Plan. But in return for this settlement offer, it maintains that certain of the physician claim-

---

**25.** As they did with the classification objections, certain physician claimants represented by Hartley Hampton joined in the § 1123(a)(4) objections made by the PCC.

ants would be forced to release both Physician Direct and Derivative Claims while other physician claimants would be required to release only Physician Derivative Claims. *Memorandum of Law of the PCC* at 44–49. The Morrison Claimants similarly assert that women who have had multiple breast-implant ruptures have more valuable claims and should be extended larger settlement offers than those woman having had only one rupture. *Objections of the Morrison Claimants* at 12. The New Zealand Claimants, as noted above, contend that their claims are more valuable than other foreign breast-implant claims on the basis that their claims could survive a *forum non conveniens* motion while other foreign breast-implant claims could not. Nevertheless, the New Zealand Claimants are extended the same settlement offer as every other Class 6.1 claimant. *Memorandum of Law of the New Zealand Claimants* at 9–12. Each of the above objectors complains that this aspect of the Plan violates the "same treatment" requirement of § 1123(a)(4).

In support of these arguments, the objectors rely on *AOV Indus.*, 792 F.2d 1140. In *AOV,* all unsecured creditors were placed in the same class. *Id.* at 1150. One of those unsecured creditors, Hawley Fuel Coalmart, possessed a direct claim against certain third parties whereas the remaining class members possessed only derivative claims against the third parties. *Id.* at 1151. The plan provided each class member with the option to either settle or litigate its claim. *Id.* The settlement offer was such that any class member who agreed to release its claim against the third parties would receive a pro rata distribution of funds contributed to the plan of reorganization by those third parties. *Id.* at 1150. Class members who found the settlement offer unacceptable would maintain the right to pursue litigation against the third parties. Hawley maintained, and the court agreed, that Hawley's direct claim was more valuable than the other class members' derivative claims. *Id.* at 1151 ("While other [Class 5 members] received their pro rata distributions from the [third-party] ... fund in exchange for the release of their *derivative* claims, Hawley was required to release a more valuable, direct claim against the [third parties].""). Because it was forced to tender a more valuable claim in return for identical consideration, Hawley argued that the treatment offered to it under the plan was unequal and in violation of § 1123(a)(4). In agreeing with Hawley the court stated:

> [T]he most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members. The other side of the coin of unequal payment, however, has to be unequal consideration tendered for equal payment. It is disparate treatment when members of a common class are required to tender more valuable consideration ... in exchange for the same percentage of recovery.

*Id.* at 1152. The current objectors contend that the treatment provided to their claims under the Plan is the "other side of the coin" that *AOV* found violative of § 1123(a)(4).

The claim treatment found offensive in *AOV.* is indeed very similar to the Plan's proposed treatment of domestic breast-implant claims, foreign breast-implant claims and physician claims. *Id.* at 1151. As was the case in *AOV,* the claimants in each of these classes are offered the opportunity to either settle or litigate their claim. Despite these similarities, we reject the reasoning of *AOV.*

To begin with, *AOV* sets forth a test of such impractical rigidity that it will be unworkable any time there is a class containing disputed and unliquidated claims. The cornerstone of *AOV*'s reasoning, of course, is the notion that all creditors within a class are entitled to share in the distribution of available funds on a *pro rata* basis. This foundational principle of bankruptcy law is simple to apply when all claims within a class are undisputed and liquidated. The court need ensure only

that available proceeds are divided equally based upon the known values of the claims.

■■■■■ The situation changes considerably, however, when a class is composed of disputed and unliquidated claims. Under this scenario, the precise value of the claims will not be known. And short of actually liquidating the claims, there is no way to determine whether a proposed settlement is offering to pay claimants the same percentage recovery on their respective claims. Any attempt to practically apply the rule of *AOV,* then, would be unduly burdensome and would severely inhibit, if not eliminate the estate's ability to settle disputed and unliquidated claims. *See id.* at 1155–56 (Starr, J., dissenting) (observing the immense impracticalities that would be involved in trying to determine the amount of consideration that each creditor in a class would be required to give in exchange for its distribution under the plan). Settlements, which serve the salutary purpose of avoiding the time, expense and uncertainty involved in liquidating a claim, are strongly favored and encouraged by the law. *See, e.g., Franks v. Kroger Co.,* 670 F.2d 71, 72 (6th Cir.1982). In fact, a prime objective of the reorganization process is to foster a negotiated resolution to the many disputes underlying the bankruptcy. Moreover, and even though *AOV* seems to suggest otherwise, a court is not empowered to tell a debtor how much it must offer to settle a claim.

Another problem with the *AOV* reasoning is that it would make the traditional use of convenience classes found in many chapter 11 plans impractical. Section 1122(b) permits a plan to "designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." 11 U.S.C. § 1122(b). *See generally* 7 *Collier on Bankruptcy,* ¶ 1122.03[5]. Convenience class claims are frequently paid the same fixed dollar amount as a dividend despite the fact that some of the claims might be more valuable than others. As a result, each class member may receive a somewhat different percentage of recovery. Outlawing such a common, well-accepted practice would be both bad public policy and contrary to the Bankruptcy Code. For one thing, § 1122(b) expressly permits such a practice. For another, § 1123(a)(4) applies to all classes of claims and interests, including convenience classes. And it is clear that § 1123(a)(4)'s mandate, that each claim within a class receive "the same treatment," does not compel the conclusion that claims of different values within a convenience class may not receive the same absolute dividend. Since the *AOV* reasoning would lead to the imposition of that result judicially, the logic of *AOV* is not persuasive.

■■■■■ The above discussion reveals only some of the significant flaws in *AOV*'s reasoning.[26] But there is another, and perhaps stronger reason for rejecting the rule propounded by that court. *AOV* simply ignored the second half of § 1123(a)(4). Section 1123(a)(4) expressly

---

**26.** A fundamental problem with the court's reasoning in *In re AOV Indus.,* 792 F.2d 1140, 1150–51 (D.C.Cir.1986), is its inappropriate attempt to address classification concerns in the context of § 1123(a)(4). As indicated, a plan may classify only "substantially similar" claims together. Section 1123(a)(4) then mandates that all claims classified together receive the "same treatment." Interestingly, the court stated that "[i]f Hawley's factual predicate *was* correct, and it had a unique, guaranteed claim against ... [the third party], its position *differed substantively* from that of its co-class members." *Id.* at 1151 (second emphasis added). This statement was one of the predicates for the court's holding that equal treatment is not necessarily equal. The court's problematic holding, which suggests that § 1123(a)(4) requires bankruptcy courts to undertake unworkable claim valuation determinations, could have been avoided altogether if instead the court had held that Hawley's substantively different claim was improperly classified. But the court inexplicably overruled Hawley's classification objection by stating that "in appropriate cases a plan may classify all unsecured creditors in a single class." *Id.*

provides that disparate treatment of a claim is indeed permissible if the holder of that claim *"agrees to a less favorable treatment."* 11 U.S.C. § 1123(a)(4) (emphasis added). For claimants in Classes 5, 6.1 and 12, the primary treatment provided under the Plan is the opportunity for a claimant to litigate her claim against the Litigation Facility. After all, when a plaintiff files suit against a defendant the expressed intent of the complaint is to resolve the matter through trial. While settlement is encouraged by the law, this outcome is achieved only in lieu of litigation. Claimants in Classes 5, 6.1 and 12 who choose the Plan's primary treatment—litigation—would be able to pursue whatever causes of action they believe they have against the Debtor. For example, a physician claimant who chooses to litigate could pursue both a Physician Direct and Derivative Claim. And at the conclusion of any trial that takes place, the litigating claimant would be entitled to payment of his judgment in full. *See, e.g., Findley v. Blinken (In re Joint Eastern and Southern District Asbestos Litig.),* 982 F.2d 721, 749 (2d Cir.1992) ("Asbestos health claimants would receive the 'same treatment' if they all were permitted to present their claims to a jury and were all paid whatever amounts the jury awarded."). Although the litigation procedures may vary somewhat between classes, within each of these classes the primary treatment is unquestionably the same for each claimant. This fact alone demonstrates that, at least with respect to these classes, the Plan fully complies with § 1123(a)(4). *Cf. In re Central Medical Center, Inc.,* 122 B.R. 568, 575 (Bankr.E.D.Mo.1990) (concluding that the equal treatment requirement of § 1123(a)(4) is satisfied when class members are subject "to the same process for claim satisfaction," even though that process may lead to a different pecuniary result for certain individual creditors).

The secondary treatment provided to claims in Classes 5, 6.1 and 12 is the settlement option. Should a claimant in one of these classes accept the Plan's settlement offer, she does so voluntarily. Therefore, even if the settlement option does provide less favorable treatment than the litigation option, any claimant who selects settlement will have done so in a manner that complies with the second clause of § 1123(a)(4). *In re Texaco Inc.,* 84 B.R. 893, 905 (Bankr.S.D.N.Y.1988) (Section 1123(a)(4) was satisfied when the creditor agreed to a settlement providing it less favorable treatment than treatment provided to other members of its class.).

For these reasons, we reject the notion that a plan must always provide strict proportional equality of payments within a class. The Court instead agrees with the view that § 1123(a)(4) "is not to be interpreted as requiring precise equality of treatment, but rather, some approximate measure [of equality]." *In re Resorts Int'l,* 145 B.R. 412, 447 (Bankr.D.N.J. 1990).

The settlement offers extended to claimants within Classes 5, 6.1 and 12 easily meet this requirement. As noted above, every physician claimant potentially has both a Direct and a Derivative Physician Claim. Every physician claimant who chooses to settle would be required to release both of these potential claims. As a result, every settling physician claimant would be providing roughly equivalent consideration. With respect to the New Zealand Claimants, the Court found that the doctrine of *forum non conveniens* does not place their claims in a materially different legal position than that held by other members of Class 6.1. Thus, the New Zealand Claimants who choose to settle would be providing consideration that is essentially the same as that provided by all other members of their class. For the same reason, the Morrison Claimants' argument that multiple-rupture breast-implant claimants who opt for settlement are required to provide greater consideration is also unpersuasive. First, it was not clear that counsel for the Morrison Claimants had standing to make this argument

for he did nòt identify a single client that has had multiple ruptures. Second, even if one of his clients has experienced multiple ruptures, counsel failed to present any evidence indicating that this would materially increase the value of such a claim.

For all of the above reasons, the Plan provides the "same treatment" to claims in Classes 5, 6.1 and 12 and satisfies § 1123(a)(4).

## C. Treatment Objections by Certain Class 7 Claimants

As explained earlier, settling holders of Class 7 claims (Silicone Material Claims) who choose the expedited payment option each receive the same amount. Those who choose the disease-payment option will receive up to 40% of the amounts payable to breast-implant claimants under the equivalent grid level. The New Zealand Claimants acknowledge that the expedited-payment option provides the same treatment to all Class 7 claimants who choose the expedited route. Their concern is with the treatment afforded under the disease-payment option. They complain that, under this option, a Class 7 foreign claimant's percentage recovery would be based on the amount payable to a similarly situated Class 6.1 or 6.2 claimant. Conversely, a Class 7 domestic claimant's percentage recovery would be based on a similarly situated Class 5 claimant. *Memorandum of Law of the New Zealand Claimants* at 14.

 This objection is without merit for a number of reasons. First, § 1123(a)(4) requires, not that class members receive equal payment, but equal treatment. The formula used to compute the amounts payable to Class 7 claimants who opt for the disease-payment option is the same for both foreign and domestic class members. In that sense, Class 7 claimants choosing the disease payment option will receive identical treatment. That the payment formula may yield different amounts depending upon the variables that each claimant brings to the equation does not detract from this fact.

Second, and more importantly, the primary treatment provided to Class 7 claimants is the opportunity to litigate their claims against the Litigation Facility. This treatment is the same for every Class 7 claimant. Secondary treatment is provided through the two settlement options. If the disease payment option does provide less favorable treatment to certain of the Class 7 claimants, their choice to elect such treatment is voluntary. Accordingly, the treatment of Class 7 is appropriate under § 1123(a)(4).

## D. Treatment Objections by Certain Class 15 Claimants

 The United States asserts that the treatment its claims would receive under the Plan violates § 1123(a)(4) in a number of respects. The Government's alleged right of recovery against the Debtor is founded upon two non-bankruptcy federal statutes. The Federal Medical Care Recovery Act ("FMCRA"), 42 U.S.C. §§ 2651–2653, forms the basis of the IHS, VA and DoD claims. Forming the basis of the HCFA claim is the Medicare Secondary Payer Act ("MSP"), 42 U.S.C. § 1395y. Under the FMCRA, when the United States provides medical treatment to a federal beneficiary for injuries that arose under circumstances creating a tort liability upon a third party, the United States is entitled to recover from that third party the reasonable costs of the treatment. 42 U.S.C. § 2651(a). The MSP similarly entitles the Government to recover, from the "required or responsible" entity, the costs of medical treatment that it provided to a federal beneficiary. 42 U.S.C. § 1395y(b)(2)(B)(ii). The Plan channels all Class 15 claims not otherwise resolved through estimation or settlement to the Litigation Facility. Neither the Debtor nor the Government have sought to estimate the claims of the Government. Nor have the parties been able to resolve these claims through settlement. Consequently, the United States' claims which remain

pending on the Confirmation Date will be channeled to the Litigation Facility.

The Government first argues that the Plan provides different treatment to Class 15 claims that relate to settling breast-implant claimants than it does to Class 15 claims that relate to non-settling breast-implant claimants. Second, the Government asserts that the claims of the Canadian provinces of Alberta and Manitoba would receive more favorable treatment under the Plan than would its claims. Lastly, relying on *AOV, supra* p. 9, the Government contends that it is being forced to give up greater consideration than the other Class 15 claimants.

Though the Government's first argument is difficult to articulate, it is essentially that the Plan creates two subclasses within Class 15 and that the treatment extended to those two subclasses is not equal. *Memorandum of Law in Support of the United States' Objection to the Joint Plan of Reorganization ("United States' Memorandum of Law")* at 11. The Government argues that the channeling of its claims to the Litigation Facility would create a subclass with respect to non-settling breast-implant claimants. The Plan also contains a cut-off provision that, according to the Government, would create another subclass of government payor claims relating to settling breast-implant claimants. *Plan* § 6.8. The cut-off provision states that certain Class 15 claimants have asserted a right to recover from the Settlement Facility if the facility pays the allowed claim of a settling breast-implant claimant without providing notice to or an adjudication of the rights of a competing Class 15 claimant. *Id.* It further provides that the Debtor will seek, on or before the Confirmation Date, an order determining that this asserted right will be cut off by the payment of the settling breast-implant claim. Once this cut-off occurs, the sole remedy of the competing Class 15 claimant will be to pursue recovery directly from the settling breast-implant claimant herself. *Id.*

The Government's argument is unpersuasive. Since Class 15 claims are those arising from injuries allegedly received by others—the federal beneficiaries with potential claims against the Debtor—they are entirely derivative of these primary claims. *See Black's Law Dictionary* 455 (Derivative lawsuits are those which arise from the injury of another.); *Transcript,* June 28, 1996 at 31 (Court stating, without refutation by counsel for Government, that the United States' claims are plainly derivative). Nevertheless, the treatment extended to a Class 15 claimant is not dependent upon the treatment extended to the underlying primary breast-implant claimant because regardless of whether the primary claimant chooses to settle or litigate her claim, the derivative Class 15 claim will be channeled to the Litigation Facility for liquidation. The Plan, therefore, does not create two subclasses of government payor claims. It creates one class. Furthermore, the claims of all governments, foreign and American, which have a similar character, are in it. And unless a Class 15 claimant has otherwise resolved its claim through settlement, the Plan's provisions discussed above would apply to all Class 15 claimants equally.

██ The Government also asserts that § 1123(a)(4) is violated because of the treatment that would be extended under the Plan to Alberta and Manitoba. Alberta and Manitoba are afforded certain rights under the British Columbia Class Action Settlement Agreement ("B.C.Agreement"). The B.C. Agreement stems from a class action lawsuit brought against the Debtor and its Canadian subsidiary by breast-implant claimants residing in certain Canadian provinces, including Alberta and Manitoba. *Proponents' Exhibit 10—B.C. Agreement* at 6. The B.C. Agreement is incorporated into the Plan, *see Plan* § 5.7, and is intended to resolve the claims of Class 6C claimants. Class 6C is composed of Canadian women who have filed proofs of claims in this case and who are also members of the class action

in British Columbia. *See, e.g., Plan* § 1.16.

Under the B.C. Agreement, Class 6C claimants would be required to notify the class action claims administrator of any unresolved subrogation claims or liens held by various Canadian provinces, including Alberta and Manitoba. *Proponents' Exhibit 10—B.C. Agreement* at 14. Upon such notification, the claims administrator will hold the amount payable to the claimant until the dispute is resolved. Subrogation claims which are disputed by the Class 6C claimant would be adjudicated by a British Columbia court. *Id.* In the event that the Class 6C claimant fails to notify the claims administrator of a subrogation claim or lien held by Alberta or Manitoba, and the affected government payor claimant asserts a subrogation claim against the Debtor, the Class 6C claimant will be required to indemnify the Debtor against such claim. *Id.*

The Court is not persuaded that the treatment provided to the United States is less favorable than that afforded Alberta and Manitoba. First, there is a notice provision in the Settlement Facility Agreement that will accrue to the benefit of the United States and all other government payor claimants. *Settlement Facility Agreement* ¶ 7.02(f)(i). It permits the Government to submit to the Settlement Facility Claims Administrator a request for notification with respect to the resolution of a breast-implant claim for which it asserts a right of reimbursement. *Id.* But in contrast to the B.C. Agreement, the Plan's notice provision does not expressly permit the Settlement Facility Claims Administrator to delay payment to the primary breast-implant claimant until any disputes as to such amounts are resolved. *Id.* § 7.02(f)(ii).

The Government acknowledges the Plan's notice provision, but complains that it is not as favorable as the one in the B.C. Agreement because: it places the onus of notification on the government payor as opposed to the breast-implant claimant; it

does not require the Settlement Facility Claims Administrator to hold the amounts payable to a breast-implant claimant until the government's reimbursement claim is resolved; and it does not permit the government to pursue a right of repayment against the Litigation Facility, as the B.C. Agreement does, in the event that disbursements are made to a breast-implant claimant before its alleged reimbursement claim is resolved.

At present, the names of breast-implant claimants in this case are protected by two confidentiality orders. *See Order Authorizing Debtor to file Certain Portions of the Schedules, the Matrix and Certain Certificates of Service Under Protective Seal; Order Regarding Debtor's Renewed Motion for Order ... Setting Bar Date for Filing Proofs of Claim ....* (allowing implant proofs of claims to be filed under certain confidentiality protections). However, the Court has already ruled, *see Transcript,* October 21, 1999 at 24–27, that it will lift confidentiality upon the confirmation of a plan of reorganization. Moreover, this ruling was not a new or previously unexpressed position of the Court. Throughout this case the Court has consistently stated that, since this is a public proceeding, the confidentiality protections must be lifted prior to the actual disbursements of proceeds to breast-implant claimants. *Transcript,* June 28, 1996 at 147 ("[N]o payments will be secret[,] ... this is a public proceeding."); *Transcript,* June 12, 1996 at 225 (Breast-implant claimants should "be aware that ... before checks get written, ... that at some point their identity will have to be known. This is a public process."); *see also Implant Proof of Claim Form* ("Limited Confidentiality: The information in this Implant proof of claim form will not become public unless the Court determines that the class of Implant claimants may be entitled to receive payment on their claims, or otherwise modifies its confidentiality order.").

Notice will, of course, be sent to breast-implant claimants informing them of the

imminent loss of confidentiality. In that notice, the Court will include a provision which informs claimants who have received breast-implant-related treatment from the United States, that they may have certain obligations to notify the Government of an intent to resolve their claim, and that they should notify either the Government or the Claims Administrator that the United States may have a competing interest in her claim. At the same time, and contrary to the situation faced by Alberta and Manitoba, the United States would not need to rely on the goodwill of such breast-implant claimants, for once confidentiality has been lifted, it will have access to their identities. Armed with this information, a search of its own files would enable the Government to identify which breast-implant claimants provide it with a potential right of reimbursement. At this point, the Government would likely have sufficient tools at its disposal to prevent disbursement until its competing rights are resolved. As can be seen, the Settlement Facility Agreement's notice provision is, in practice, no less favorable to the United States as the B.C. Agreement is to Alberta and Manitoba.

The fact that Alberta and Manitoba may later choose to seek recovery on their unreimbursed subrogation claims is also not problematic. Any direct claims that Alberta or Manitoba assert against the Debtor will be channeled to the Litigation Facility on the Confirmation Date. This means that, should Alberta and Manitoba decide to pursue their claims against the Debtor, those claims will be resolved through the Litigation Facility in exactly the same manner as the claims of the United States Government.

Relying on the discredited *AOV, supra* p. 9, the Government's final § 1123(a)(4) objection is that, in return for the same treatment, it would be forced to provide greater consideration than other Class 15 claimants. *United States' Memorandum of Law* at 12. To begin with, it is inconsistent for the Government to now argue, as part of this objection, that it would receive "the same treatment" as other Class 15 claimants. But more importantly, since this objection is framed in terms of the consideration that the Government would be required to provide, it suggests that the Government is being extended a settlement offer under the Plan. However, this is not the case. The Plan would provide the Government with one claims resolution option—litigation. Thus, the issue of consideration is not relevant.

The treatment that would be provided to the Government's claims under the Plan is not identical to the treatment extended to Alberta and Manitoba. But as noted, identical treatment is not what § 1123(a)(4) requires. Rather, its requires within-class claim treatment to provide an approximate measure of equality. Without question, the Plan accomplishes this with respect to Class 15 claimants, and so, the Government's treatment objections are overruled.

## IV. Conclusion

In Part II the Court determined that the Plan's classification scheme fully complies with the requirements of § 1122(a). The Court further determined in Part III that the treatment afforded to claimants under the Plan satisfies § 1123(a)(4). Therefore, the objections to classification and treatment lodged by certain claimants in Classes 4, 5, 6.1, 6.2, 7, 12 and 15 are overruled.